IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI


ANKENETH CORBIN,

PLAINTIFF

VS.              CASE NO.  4:23-CV-00516-JAR


BLACK JACK FIRE PROTECTION
DISTRICT and DAVID CALHOUN


DEFENDANTS



DEPOSITION OF ANKENETH CORBIN

TAKEN ON BEHALF OF THE DEFENDANTS

JANUARY 25, 2024

**EXHIBIT  1**

```
 1   IT IS HEREBY STIPULATED AND AGREED, by and between

 2   counsel for the Plaintiffs and counsel for the

 3   Defendants, that the deposition of ANKENETH CORBIN

 4   may be taken in shorthand by Pamela K. Needham,

 5   Certified Court Reporter (IL 084-002247 and MO 505),

 6   and afterwards transcribed into typewriting; and the

 7   signature of the witness is reserved.

 8                    *    *    *    *    *

 9                 (On the record at 8:55 a.m.)

10                    ANKENETH CORBIN,

11   of lawful age, produced, sworn, and examined on

12   behalf of the Defendants deposes and says:

13                      EXAMINATION

14   QUESTIONS BY MR. ALLEN

15        Q.   Good morning, sir, would you please

16   state your full name for the record?

17        A.   Ankeneth Corbin.

18        Q.   And for the court reporter, will you

19   please spell your first name?

20        A.   A-N-K-E-N-E-T-H.

21        Q.   Thank you, sir.  Mr. Corbin, we've met

22   before, my name is John Allen, I represent the Black

23   Jack Fire Protection District and David Calhoun, the

24   defendants in this case which you've brought; you

25   understand that, right?
```

```
 1          A.   I do.
 2          Q.   Okay.  We're here today to take your
 3   deposition in this case.  Have you ever been deposed
 4   before?
 5          A.   No, sir.
 6          Q.   Okay.  Couple ground rules.  As you can
 7   see, all of my questions and all of your answers are
 8   being taken down by our court reporter; okay?
 9          A.   Yes.
10          Q.   For that reason, you're doing a great
11   job, make sure you answer all of my questions out
12   loud; okay?
13          A.   Yes.
14          Q.   All right.  Nodding heads, shaking heads
15   is hard for the court reporter to take down, so I
16   need to make sure that you answer all of my
17   questions out loud, is that okay?
18          A.   Okay.
19          Q.   All right.  If you don't answer any --
20   or understand any of my questions rather, let me
21   know that, okay, sir?
22          A.   I will.
23          Q.   All right.  If you answer any of my
24   questions, I'm going to assume that you understood
25   it, is that fair?
```

```
 1            A.    That's fair.
 2            Q.    All right.  I mentioned before we went
 3   on the record today that you could take a break at
 4   any time, so just let me know if you need to take a
 5   break, as long as there's no question pending, I'll
 6   let you take that break, okay?
 7            A.    Okay.
 8            Q.    All right, thank you.  Other than this
 9   lawsuit, and other than the charges of
10   discrimination that you filed against the Black Jack
11   Fire Protection District, have you been involved in
12   any other lawsuits?
13            A.    Employment lawsuits or...
14            Q.    Any lawsuits.
15            A.    No, not that I recall, either as a
16   plaintiff or defendant.
17            Q.    And that's what I was going to ask;
18   you've never been sued in any other case?
19            A.    No.
20            Q.    And you've never been a plaintiff,
21   you've never sued anybody in any other case.
22            A.    No, sir.
23            Q.    What did you do to prepare for your
24   deposition this morning?  And let me tell you that I
25   am not entitled to and I don't want to know about
```

1   the substance of your conversations with your

2   lawyer, but I want to know who you talked to and

3   what you did to prepare, outside of those

4   conversations?

5           **A.   Spoke to my attorney.**

6           Q.   Did you speak to anybody else?

7           **A.   Maybe my mom and other people, just let**

8   **them know I was being deposed today.**

9           Q.   Okay, what's your mom's name?

10          **A.   Easter.**

11          Q.   Is Corbin her last name?

12          **A.   Warren.   W-A-R-R-E-N.**

13          Q.   Does she live here locally?

14          **A.   Yes.**

15          Q.   And I'm asking, and I'm going to ask you

16  a little bit more about family you might have in the

17  area, because if we go to trial in this case I want

18  to know if there are any people related to you who

19  might be called to the jury panel, so that's why I'm

20  asking those questions.

21          What did you talk to your mom about in

22  connection with the deposition?

23          **A.   Just this morning I was heading to be**

24  **deposed.**

25          Q.   Okay.  Did you talk to your wife about

1    this deposition?

2          A.    I did.

3          Q.    Okay.  What did you talk to your wife

4    about?

5          A.    That the deposition is the 25th.

6          Q.    Okay.  Did you talk to anybody other

7    than your mom, your wife, and your attorney in

8    preparation for this deposition?

9          A.    No.

10         Q.    Did you review any documents, sir?

11         A.    I did.

12         Q.    What documents did you review?

13         A.    The documents that my attorney gave me

14   last night.

15         Q.    And what documents were those?

16         A.    673 pages of documents that appeared to

17   be primarily insurance stuff.  And also the

18   documents that I had submitted to the EEOC.

19         Q.    It sounds like these 673 or so pages of

20   primarily insurance stuff were the documents that

21   we've produced in this case; is that your

22   understanding?

23         A.    I'm not sure where they came from, I

24   just got an email saying that I hadn't seen them, I

25   didn't know who produced them.

1        Q.   Fair enough.

2        **A.   But some of the documents I produced.**

3        Q.   Okay.  And then I was going to get to

4   that next, and some of those documents were the

5   documents that you submitted to the EEOC, is that

6   correct?

7        **A.   Yes, and the Fire District prior to the**

8   **EEOC.**

9        Q.   And we'll talk about that, I do

10  understand that actually some of the documents you

11  submitted to the EEOC were documents that you had

12  submitted to the Fire District, is that true?

13       **A.   Correct.**

14       Q.   All right.  And just so we're clear on

15  the record today, when we talk about Fire District

16  or we talk about the District, you and I can agree

17  that we're talking about the Black Jack Fire

18  Protection District, correct?

19       **A.   Correct.**

20       Q.   All right.  I just want to make sure

21  that we're clear and when we go back and look at the

22  record there's no confusion in that regard, is that

23  okay?

24       **A.   Yes.**

25       Q.   Okay, very good.  Did you review all of

1  the 673 or so pages of documents that your attorney

2  had emailed to you?

3         **A.    No, sir, I did not.**

4         Q.   Probably didn't have the time, right?

5         **A.    No, sir, I did not.**

6         Q.   Prior to receiving those email -- or

7  those documents last night, had you ever seen them

8  before?  And I am not talking about the documents

9  you submitted, I'm talking about the 673 pages of

10 documents.

11        **A.    Being an administrator of the fire**

12 **department, I would assume that I had seen some of**

13 **them, but not in that detail.**

14        Q.   And is it, is it fair to say, though,

15 that you hadn't seen them in connection with this

16 litigation, right?  If you had seen any of those

17 documents, it would have been in the course and

18 scope of your job as an employee of the District; is

19 that fair to say?

20        **A.    Correct.**

21        Q.   All right.  Are you on any medications,

22 sir?

23        **A.    No, sir.**

24        Q.   You're on no medications that would

25 impact your ability to testify truthfully here

 1     today, correct?

 2              A.   **No, sir, not at all.**

 3              Q.   And are you aware of any other

 4     circumstances that would prevent you from testifying

 5     truthfully here today?

 6              A.   **No, sir.**

 7              Q.   Okay, good, thank you.  When were you

 8     born?

 9              A.   ███████████ **1964.**

10              Q.   All right, what's your Social Security

11     Number?

12              A.   **Xxx-xx-1786.**

13              Q.   I'm sorry, last four, please?

14              A.   **1786.**

15              Q.   Thank you, sir.  And where were you

16     born?

17              A.   **St. Louis, Missouri, Homer G. Phillips**

18     **Hospital.**

19              Q.   I take it you have a valid driver's

20     license?

21              A.   **Yes, sir, I do.**

22              Q.   Has that ever been suspended, revoked,

23     anything like that?

24              A.   **No, sir, not that I can recall.**

25              Q.   Do you have a CDL?

```
 1            A.    No, sir.

 2            Q.    Have you ever gone by any other names or

 3     aliases?  I know your full name is Ankeneth, I

 4     understand that perhaps Ken?

 5            A.    Yes.

 6            Q.    Do you go by anything other than

 7     Ankeneth or Ken?

 8            A.    No, sir.

 9            Q.    Where do you live, sir?

10            A.    ████████████████████████████████

11     ██████

12            Q.    And how do you spell that?

13            A.    ████████████████████████████████

14            Q.    In ████████?

15            A.    Correct.

16            Q.    What's the zip?

17            A.    ██████

18            Q.    Thank you, sir.  How long have you lived

19     at that address?

20            A.    Between four and five years.

21            Q.    And where did you live before that, sir?

22            A.    ████████████████████

23            Q.    How do you spell that?

24            A.    ████████████████████  common

25     spelling.
```

```
 1          Q.   Is that in ███████████?
 2          A.   Correct.
 3          Q.   Same zip?
 4          A.   ██████
 5          Q.   Thank you, and how long did you live at
 6     that address?
 7          A.   Approximately three years.
 8          Q.   Who lives with you at the ████████████
 9     ██████ address?
10          A.   My wife.
11          Q.   What's your wife's name?
12          A.   Marikit, M-A-R-I-K-I-T, Villasis-Corbin.
13          Q.   How do you spell Villasis?
14          A.   V-I-L-L-A-S-I-S.
15          Q.   Okay, does anybody else live there with
16     you?
17          A.   My son.
18          Q.   What's your son's name?
19          A.   Akihiro A-K-I-H-I-R-O, Hermes,
20     H-E-R-M-E-S, Villasis-Corbin.
21          Q.   How old is Akihiro?
22          A.   Seven.
23          Q.   Does anybody else live with you at that
24     address?
25          A.   Yes.
```

```
 1            Q.   Who else?

 2            A.   His care taker, Andi, A-N-D-I, Arimon,

 3    A-R-I-M-O-N.

 4            Q.   Does Akihiro have special needs?

 5            A.   He does.

 6            Q.   Okay.  Does anybody else live with you

 7    at that address?

 8            A.   Temporarily one of our employees.

 9            Q.   What is that employee's name?

10            A.   I don't...

11            Q.   And it's okay, and by the way, if

12    there's anything you don't remember, just tell me

13    that, I only want and am entitled to your best

14    recollection.

15            A.   Thereese, T-H-E-R-E-E-S-E.

16            Q.   And do you remember Thereese's last

17    name?

18            A.   Navidad, N-A-V-I-D-A-D.

19            Q.   And you said one of our employees.  Do

20    you own a company?

21            A.   My wife has a bake shop.

22            Q.   Do you have an ownership interest in

23    that company?

24            A.   No, sir.

25            Q.   All right.  So Thereese is employed by
```

```
 1   your wife at the bake shop.
 2         A.   Yes.
 3         Q.   Okay.  And what is the name of the bake
 4   shop?
 5         A.   Lapatisserie, L-A-P-A-T-I-S-S-E-R-I-E.
 6         Q.   And again, you have no ownership
 7   interest in that business.
 8         A.   No, sir.
 9         Q.   Anybody else living at your house with
10   you, other than the people you've just testified to?
11         A.   No, sir.
12         Q.   Do you have any other children other
13   than your son Akihiro?
14         A.   I do.
15         Q.   Okay.  Tell me -- what are the names of
16   your other children?
17         A.   Taylor Corbin, T-A-Y-L-O-R.
18         Q.   How old is Taylor?
19         A.   21 -- 20.  She'll be 21 in March.
20         Q.   My daughter turns 21 in March.  Where
21   does Taylor live?
22         A.   Primarily on campus at school at SIU-E,
23   Edwardsville.
24         Q.   Okay.  Does she maintain a Missouri
25   residency, though?
```

```
 1          A.    Correct.

 2          Q.    Okay.  And is that affiliated with your

 3    home address or somebody else's?

 4          A.    No, sir.

 5          Q.    Okay.

 6          A.    Her mother's.

 7          Q.    And what is that address, if you know?

 8          A.    I don't.

 9          Q.    Okay.

10          A.    They moved recently.

11          Q.    Okay.  What is her mother's name?

12          A.    Brenda Davis, B-R-E-N-D-A, Davis.

13          Q.    Were you married to Brenda?

14          A.    No, sir.

15          Q.    And by the way, how long have you been

16    married to Marikit?

17          A.    Approximately ten years.

18          Q.    And were you married before that?

19          A.    No, sir.

20          Q.    Any other children other than Akihiro

21    and Taylor?

22          A.    Jeremy Corbin.

23          Q.    How old is Jeremy?

24          A.    29.

25          Q.    Where does Jeremy live?
```

1          **A.    O'Fallon Fire Protection District.**

2          Q.    And how long were you Deputy Chief?

3          **A.    Approximately six to seven years, until**

4    **I went to Black Jack.**

5          Q.    All right, and so now I understand that

6    you found out that Black Jack around that time was

7    looking for somebody to be hired as Assistant Fire

8    Chief, is that correct?

9          **A.    Correct.**

10         Q.    All right, and how did you find out

11   about that opening?

12         **A.    Just through various training meetings**

13   **and... I'm not sure if it was advertised in the**

14   **paper, but just through word of mouth.**

15         Q.    Who was the Chief at that time?

16         **A.    The Chief where?**

17         Q.    At Black Jack.

18         **A.    Michael Gantner.**

19         Q.    Tell us about the application process to

20   Black Jack.  Did you submit a written application?

21         **A.    I did.**

22         Q.    What else did you submit to Black Jack?

23         **A.    I don't remember at that time, just**

24   **whatever was required, I don't remember if they**

25   **requested a resume or anything of that nature, I**

1    just remember that and the interview process.

2         Q.    All right, so you do remember that you

3    submitted a written application, you don't remember

4    if you submitted anything else in writing, correct?

5         A.    Correct.

6         Q.    But you do recall the interview process,

7    so tell, tell us about that, please, what was the

8    interview process.

9         A.    As best I can recall, just my experience

10   as a Chief Officer, maybe a couple of questions

11   relative to management styles and problem solving.

12        Q.    Who did you meet with during the

13   interview process?

14        A.    I remember the three board of directors.

15        Q.    Who were the three board of directors at

16   that time?

17        A.    Sylvester Taylor, Randy Adler, and

18   Kenneth Schmalbeck, S-C-H-M-A-L-B-E-C-K.

19        Q.    And for the record, what year was that

20   in that you went through the interview process, the

21   hiring process at Black Jack?

22        A.    As best I can recall, the same year that

23   I got hired, either in 2009 or '10.

24        Q.    What I show is November 3rd of 2010,

25   that's at least what you had alleged in the

1    petition; does that sound right, sir?

2        A.   **Correct.**

3        Q.   Okay.  Did you meet with Chief Gantner

4    in connection with the interview process?

5        A.   **I'm sure I did at some point.  I don't**

6    **believe he interviewed me personally.**

7        Q.   Okay, so the only interviews you recall

8    were with the three board of directors.

9        A.   **I don't remember if the attorney would**

10   **have been there or not at that particular time.**

11       Q.   The attorney for the District?

12       A.   **Correct.**

13       Q.   Do you recall who the attorney for the

14   District was at that time?

15       A.   **Daniel Bruntrager.**

16       Q.   Okay.  Do you recall ever meeting with

17   Mr. Bruntrager in connection with the interview

18   process?

19       A.   **I do not.**

20       Q.   To your understanding, did the three

21   directors, Sylvester Taylor, Randy Adler and Kenneth

22   Schmalbeck, make the unanimous decision to hire you?

23       A.   **I don't remember if it was unanimous, I**

24   **can't remember that.**

25       Q.   In any event, you were hired as the

```
 1              Q.   How long were you Assistant Fire Chief
 2    for the Black Jack Fire Protection District?
 3              A.   Approximately six years until the
 4    retirement of Michael Gantner.
 5              Q.   And at that time were you promoted to
 6    Fire Chief?
 7              A.   I was.
 8              Q.   What was the process for you to be
 9    promoted to Fire Chief after the retirement of Chief
10    Gantner?
11              A.   There was an interview process.
12              Q.   Who did you interview with?
13              A.   The Board of Directors.
14              Q.   Who was the Board of Directors at that
15    time?
16              A.   David Calhoun, Randy Adler, and Kenneth
17    Schmalbeck.
18              Q.   Did you interview with the three of them
19    together, or separately?
20              A.   Together.
21              Q.   Do you recall that interview, sir?
22              A.   No, sir, not particularly.
23              Q.   Do you recall how long that interview
24    lasted?
25              A.   No, sir, I do not.
```

```
 1          A.   Not specifically, I would imagine 2012
 2   to 2014.
 3          Q.   Do you know if the Board of Directors
 4   voted unanimously to promote you to Fire Chief?
 5          A.   I do not.
 6               (Deposition Exhibit Number A marked for
 7   identification.)
 8          Q   (By Mr. Allen) I'm going to hand you what
 9   I have marked as Defendant's Exhibit A, and I'd ask
10   you to take a look at that document, and let me know
11   when you're ready, please.
12               (Witness peruses document.)
13               THE WITNESS:  Okay.
14          Q   (By Mr. Allen) Are you familiar with that
15   document, sir?
16          A.   I am.
17          Q.   You've seen that before?
18          A.   I have.
19          Q.   And what is that document that's been
20   marked as Defendant's Exhibit A?
21          A.   It is a copy of the agreement for the
22   Fire Chief, pay, benefits, and compensation.
23          Q.   All right.  And the title of the
24   document is Resolution Number 20-02, is that
25   correct?
```

```
 1          A.   It is.

 2          Q.   Do you understand this to be a

 3    resolution that was adopted unanimously by the Board

 4    of Directors on January 14 of 2020, is that correct?

 5          A.   Correct.

 6          Q.   Okay.  I want to ask you about the job

 7    description that begins on Page 3 under Number 8.

 8    Do you see that, sir?

 9          A.   3, Number --

10          Q.   Page 3 of 5.

11          A.   3 of 5, okay.

12          Q.   And there's Number 8 at the top, do you

13    see that, sir?

14          A.   Correct, I do.

15          Q.   Okay.  Were you involved in preparing

16    this job description?

17          A.   I was.

18          Q.   All right, did you actually prepare this

19    job description?

20          A.   With District Counsel Daniel J.

21    Bruntrager.

22          Q.   Okay.  And what was the process?  Did

23    you write it, send it to him; did he write it, send

24    it to you?  How did that work, if you recall?

25          A.   I primarily sent the majority of it to
```

 1   him and he tweaked it or modified it.

 2        Q.   Does this job description set forth your

 3   job description the entire time you were Fire Chief

 4   at the Black Jack Fire Protection District?

 5        A.   I would say that those are the primary

 6   responsibilities, there were probably things that

 7   would arise from time to time that aren't included

 8   in there that would fall upon my scope of authority.

 9        Q.   Was part of your job duties as Chief at

10   the Black Jack Fire Protection District to be

11   present at the firehouse?

12        A.   Correct.

13        Q.   And how often were you expected to be at

14   the firehouse?

15        A.   How often?

16        Q.   Yes, sir.

17        A.   You'll have to rephrase the question,

18   the job also requires me to be in the community and

19   attending other meetings and other things, so I'm

20   not sure I understand the question.

21        Q.   Okay.  So we can, we can kind of divide

22   it up in that fashion.

23        A.   Okay.

24        Q.   And you can answer in that way.  What

25   I'm trying to figure out and what I'm entitled to

```
 1    know is what is your understanding about how often

 2    you were required to be in the firehouse, as opposed

 3    to out in the community, and we can divide it up, if

 4    you want to tell me percentage of time, that's fine.

 5         A.    I don't have a percentage, it would be

 6    as required.

 7         Q.    Okay, what was required then?

 8         A.    As stated in the job description, my job

 9    was to also listen to the community, respond to

10    their concerns and address their needs and concerns.

11         Q.    I understand that.  So in your

12    experience then how often were you at the firehouse

13    versus out in the community helping the community?

14         A.    I wouldn't have a specific answer.  As

15    needed.

16         Q.    Did you ever tell the administrative

17    staff at the firehouse to let you know when the

18    Board of Directors were coming in so that you could

19    make sure you were in the firehouse?

20         A.    No.

21         Q.    You had an office in the firehouse,

22    correct?

23         A.    Correct.

24         Q.    And that firehouse is located where?

25         A.    5675 North Highway 67.
```

```
 1              Q.   We'll talk about this a little bit

 2    later, but your office also had places for mailboxes

 3    for other people, correct?

 4         A.   Correct.

 5         Q.   Including the directors?

 6         A.   Correct.

 7         Q.   So the directors, of course, had reason

 8    to be in that office, correct?

 9              MR. HACKNEY:  Object to form.

10         Q    (By Mr. Allen) The directors could go get

11    their mail from that office.

12         A.   (Nods affirmatively.)

13         Q.   Correct?

14         A.   They could go anywhere, which is

15    irregular.

16         Q.   It would be irregular for a director

17    into go into that office to get his mail?

18         A.   It is irregular for fire chiefs -- for

19    directors to go into the Fire Chief's office; it is.

20    In other districts it's not done.

21         Q.   All right, I'm asking about Black Jack.

22         A.   Okay.

23         Q.   All right, and you told me that the

24    directors have their mailboxes in that office.

25         A.   I did.
```

```
1           Q.   All right.  So would you agree with me
2    that it's not unusual for a director to go into that
3    office to get his mail?
4           A.   It's not.
5           Q.   Okay.  Would other people have occasion
6    to go in that office?
7           A.   They would.
8           Q.   Okay.  And who would those people be,
9    and why would they go to the office?
10          A.   The administrative secretaries who
11   retrieve documents, or other employees with
12   questions or recommendations or meetings, counseling
13   employees, or things of that nature.
14          Q.   All right, so Board of Directors would
15   be in there, not unusual to get their mail, the
16   administrative staff would be in there, not unusual
17   for them to be in there, correct?
18          A.   No, sir.
19          Q.   All right.  And other employees, it
20   wouldn't be unusual for other employees to be in
21   that office.
22          A.   Correct.
23          Q.   And just to be clear, you don't have an
24   estimate for us, as you sit here today, as to the
25   amount of time you actually spent in the, in the
```

```
 1   correct?
 2         A.   I agree that all three signed it, I
 3   don't know if on vote if it was unanimous, as I
 4   stated earlier.
 5         Q.   In any event, you agree that all three
 6   signed this resolution.
 7         A.   That I do.
 8         Q.   All right.  And this resolution also
 9   gave you pay raises actually going backwards to
10   2019, is that correct?
11         A.   Correct.
12         Q.   All right.  So now I want to turn our
13   attention to your allegations in this case, and what
14   I, what I am going to try to do and I'm going to try
15   to be as efficient as possible is get the factual
16   basis for the allegations made.  I understand you're
17   working with your lawyer, your lawyer makes some
18   legal arguments, right, but there is a factual
19   basis, there has to be a factual basis for those
20   legal arguments, right?  So now what I want to try
21   to do is get into that factual basis.  Fair?
22         A.   Yeah.
23              MR. HACKNEY:  Is this a good window of
24   time for a five-minute break?
25              MR. ALLEN:  It is, yes.
```

1   showing you my laptop that has my file that includes

2   what I believe to be the documents produced by your

3   lawyer in this case, all right?  And I'm, this is

4   how they appear, the first one I'm going to open is

5   a recording, I don't even know if it's audio or

6   video, but I'm going to open this up, and you and I

7   will see this together.  Do you see this, this is

8   a --

9        **A.   I do.**

10        Q.   Well, tell us for the record what this

11   is?

12        **A.   That is a video of Director David**

13   **Calhoun in my office going through the drawers in my**

14   **office.**

15        Q.   And the dated stamp, I'm going to replay

16   it, I'll replay it as many times as you like, the

17   data stamp on this video is August 21st, 2022; do

18   you see that?

19        **A.   I do.**

20        Q.   And it indicates 9:40 in the morning; do

21   you see that?

22        **A.   I do.**

23        Q.   Do you have any reason to dispute that

24   this video was taken August 21st, 2022, at 9:40 in

25   the morning?

1          **A.   I have no reason to dispute that if**
2    **that's what's on the...**
3          Q.   And how -- did you position the
4    recording device that was used here?
5          **A.   I did.**
6          Q.   What kind of recording device?
7          **A.   Wyze.**
8          Q.   How do you spell that?
9          **A.   W-Y-Z-E.**
10         Q.   Do you have that device now?
11         **A.   It's at home.**
12         Q.   Can you produce that for us?
13         **A.   I can.**
14              MR. HACKNEY:  Well, I, subject to any
15    objections we might have to producing the Wyze.
16         Q   (By Mr. Allen) Well, did you use that
17    device to record anything other than your office?
18              THE WITNESS:  No.
19         Q.   Okay.
20         **A.   Oh.  That device is, Wyze has a set of**
21    **cameras, I use it for my home, I basically took the**
22    **Wyze device that set up like in the basement, in the**
23    **man cave and brought it.**
24         Q.   So I have no interest in your recordings
25    at home.

```
 1          A.   Okay.
 2          Q.   But I do want every single recording
 3    from the office.  So, you know, we can talk about
 4    how best to produce it.
 5          A.   Yeah.
 6          Q.   But I do want that.  So... and you put
 7    that camera in the office for the purpose of
 8    recording Director Calhoun?
 9          A.   No.
10          Q.   Why did you put it in the office?
11          A.   For the purpose of finding out who was
12    removing items, moving items around, and also for
13    protection, it's a security camera.  Mr. Calhoun had
14    become so hostile and verbally abusive, and after
15    multiple attempts to the Board to gain some type of
16    I guess resolution...
17          Q.   Where in the office are the mailboxes
18    for the directors?
19          A.   Over there against that wall by the file
20    cabinets.
21          Q.   Over by the file cabinets?
22          A.   Right there, where his back is turned.
23          Q.   And I'll replay it.
24          A.   Yeah.
25          Q.   There's, I see also a printer over here.
```

```
 1   Was that a communal printer to be used by --

 2        A.   No, sir.

 3        Q.   -- other people?

 4        A.   No, sir.

 5        Q.   No?

 6        A.   No, sir.

 7        Q.   Okay.  So the directors would come in,

 8   you said the administrators would come into the

 9   office and others would come into this office, as

10   well, correct?

11        A.   Correct.

12        Q.   Okay.  I'm showing to you another video

13   that's been produced in this case, this one is date

14   stamped 9-18-2022; do you see that, sir?

15        A.   Correct.

16        Q.   And is this video from a camera that you

17   placed?

18        A.   Correct.

19        Q.   This is from a different angle, correct?

20        A.   Correct.

21        Q.   Is this a separate camera?

22        A.   Same camera.

23        Q.   Did you move the camera?

24        A.   I did.

25        Q.   Okay, how often would you move this
```

1   camera?

2        A.   There was not a particular time

3   schedule.  The first place -- the first position

4   that the camera was is where you saw that angle.  It

5   didn't give a vantage point to see what was being

6   moved or taken or what, planted or whatever may be

7   the case, so I moved it to get a better position of

8   what was taking place in my office on weekends.

9        Q.   When I look at these videos, I don't, I

10  see Director Calhoun taking pictures, but I don't

11  see him taking anything; do you see him taking

12  anything?

13       A.   Not, no.

14       Q.   Okay.  Do you have video of Director

15  Calhoun ever taking anything from your office?

16       A.   I do not.

17       Q.   Okay.  When did you first install this

18  Wyze camera in this office?

19       A.   About approximately that same time you

20  see that.

21       Q.   How much other video is available on

22  that camera?  Of the office.

23       A.   There's only videos of Mr. David Calhoun

24  in those incidents.

25       Q.   Did you delete everything else?

1        Q.   The next thing listed here on Black Jack

2    Fire is retirement plans.  Do you see that?

3        **A.   Correct.**

4        Q.   And it's my understanding that part of

5    your, at least part of your age discrimination claim

6    relates to the fact that Director Calhoun would make

7    comments and ask you about when you were retiring,

8    is that correct?

9        **A.   Correct.**

10       Q.   All right, would anybody else have those

11   conversations with you?

12       **A.   No.**

13       Q.   How old are you?

14       **A.   I'm 59.**

15       Q.   Do you know how old Director Calhoun is?

16       **A.   I do not.**

17       Q.   So nobody else other than Director

18   Calhoun made comments about when your retirement

19   was; true?

20       **A.   No, sir.**

21       Q.   You state here you're being blamed by

22   firefighters for the Board's decision not to extend

23   the retirement age past 60, and I've seen

24   discussions about this in your petition and other

25   places.  What is your position with respect to why

1   were made were only grooming Mr. Calhoun and the

2   other two Board of Directors to teach me to be more

3   submissive.

4        Q.   Did Director Calhoun ever use the N word

5   towards you?

6        A.   He did not.

7        Q.   Did Director Calhoun ever make any sort

8   of racial comment whatsoever to you?

9        A.   He did not.

10       Q.   Okay.

11       A.   Only that:  You think you can do what

12  the F you want to do around here.

13       Q.   That makes no reference to race, does

14  it?

15       A.   It doesn't make to race, but the Board,

16  when making reference to making statements like:

17  You're getting too big for your britches.  He had

18  witnessed it enough, you know, slaves wore britches,

19  and --

20       Q.   Who -- I'm sorry to interrupt, go ahead

21  and finish?

22       A.   Randy Adler, you know.

23       Q.   Okay, and so let's be clear about that.

24  Randy Adler was not a member of the Board at the

25  time you were terminated, correct?

```
 1          A.   He was not.
 2          Q.   When was Randy Adler last a member of
 3     the Board of Directors?
 4          A.   20... would that have been 18?
 5          Q.   And I can check, I'm only asking for
 6     your best --
 7          A.   Yeah, no problem, no problem.
 8          Q.   -- your best knowledge.  Now you haven't
 9     named Mr. Adler as a defendant in this case, you
10     have named Mr., Director Calhoun.
11          A.   Yeah.
12          Q.   Correct?
13          A.   Correct.
14          Q.   Director Schmalbeck was one of the
15     directors at the time of your termination, correct?
16          A.   Correct.
17          Q.   Did he ever use the N word?
18          A.   No.  He didn't object either.
19          Q.   Well, that wasn't my question, my
20     question was --
21          A.   Okay.
22          Q.   -- did he ever use the N word.
23          A.   No, he did not.
24          Q.   Did he ever make any comments to you
25     about your race?
```

1           **A.    No.**

2           Q.    The other director who was there and

3    voted unanimously to terminate your employment was

4    director that Orlanda Smith.  He's also African

5    American, correct?

6           **A.    Okay.**

7           Q.    Correct?

8           **A.    Correct.**

9           Q.    Did Director Smith ever make any

10   comments about your race?

11          **A.    No, he did not.**

12          Q.    Did Director Smith ever use the N word?

13          **A.    Not that I'm aware of, not in my**

14   **presence, not towards me.**

15          Q.    So it sounds like the primary basis for

16   your race discrimination claim are these comments

17   made by Director Adler sometime prior then to 2018?

18          MR. HACKNEY:  Object to form.

19          Q   (By Mr. Allen) Is that correct?

20          THE WITNESS:  The point I was trying to

21   make that black-on-black crime and these type of

22   African American men taking out racism on other

23   African American men is as old as slavery, there's

24   no legal basis for it that I could call, but it does

25   happen.

```
 1          A.    Michael Gantner.

 2          Q.    In what ways was Chief Gantner treated

 3    differently than you?

 4          A.    Mr. Gantner's separation of the fire

 5    department, he was paid 100 percent of all his

 6    accumulated sick time and vacation days.

 7          Q.    Was he terminated for cause?

 8          A.    He was not.

 9          Q.    In terms of how he was treated...

10    treated differently than you.

11          A.    In terms of his ability to attend

12    training, the level of scrutiny and things that he

13    was allowed to do.  He was also given extra vacation

14    days every year, and mine remained the same for

15    approximately 16 years.  When he left he was pretty

16    much allowed to carry over vacation days and do

17    whatever he pleased; I was not allowed to do that.

18          Q.    Did he have more seniority than you?

19          A.    My seniority was the same rank.

20          Q.    Right.

21          A.    He was the Fire Chief and I was the Fire

22    Chief.

23          Q.    But had he been a chief longer than you?

24          A.    He has, but when you refer to the

25    Collective Bargaining Unit as you have, our
```

1    the Board refuses to converse with me, and I didn't

2    want to be caught in the middle, I needed an

3    employment contract so if things went south, I

4    wouldn't just get thrown under the bus, because

5    things were getting missed.

6          Q.   Were you sending these letters to

7    leverage an employment contract?

8          A.   No.  No.  I was sending these letters

9    because everyone in the Fire District, the employees

10   or in the Bargaining Unit, including the Battalion

11   Chief, which is irregular, most fire districts don't

12   have chief officers that are battalion chiefs in the

13   Bargaining Unit, but I was allowed to participate.

14   The Fire Chief and the Assistant Chief were the only

15   two people not protected by some type of agreement.

16   Because of the success that the firefighters had

17   experienced and where we went financially, and how

18   we'd grown, they also encouraged me to get a

19   contract to protect us.  I had never asked for one

20   before, I had been there approximately all those

21   years and had never asked for one, I just hoped that

22   my body of work would be sufficient.

23         Q.   When did you first ask for a contract?

24         A.   Pretty much at the time you see that

25   one.

```
 1              Q.    That one referring to the Resolution?

 2              A.    Correct.

 3              Q.    Okay.

 4              A.    Just prior to.

 5              Q.    So the Resolution --

 6              A.    2002.

 7              Q.    It's dated January 14, 2020.

 8              A.    Okay.  Yeah, 2020.

 9              Q.    Okay, so not long before that would have

10      been the first time you asked for an employment

11      contract.

12              A.    Prior to that I approached the Board

13      about an employment contract.  It was put off

14      because I believe at the same time they were working

15      on the Bargaining Unit's new contract, it was about

16      time for that to expire, I also felt like the

17      previous Resolution included the Chief, the Fire

18      Chief and the administrative secretaries.  I

19      encouraged the Board that the Fire Chief's pay and

20      benefits should be separate, so should the Assistant

21      Chief, and so should the administrative secretaries.

22              Q.    And to be clear, you refer to this as a

23      contract, but really what this is is a Resolution,

24      it's a one-party Resolution setting forth certain

25      pay and other benefits and your job duties, right?
```

1    multiple, but all of them pretty much state the same

2    thing, that discrimination, intimidation,

3    threatening and bullying would not be tolerated.  I

4    also said that leaving it on my desk is not

5    addressing the problem, and I also said:  This is

6    just clearly an effort to protect Mr. Calhoun,

7    because Mr. Smith had stated this was primarily in

8    reference to, about the vehicle and complaining

9    about, you know, Mr. Calhoun, so he should have

10   recused himself.  And I reminded him that they were

11   present in other meetings to where they became

12   hostile, and no one would say a word, not the Board

13   of Directors, not the attorney who was present and

14   witnessed this, he would just let it go on.

15        Q.   And again, Director Calhoun, who is an

16   African American, has never made any comments to you

17   about your race.  Ever.  True?

18        A.   Not that I recall.

19        Q.   Black Jack Fire 42.  Will you identify

20   that document for the record, please?

21        A.   This is the initial... or I should say

22   one of the initial complaints dating back to 2017,

23   and the first complaint I believe that was filed

24   with the Board against Mr. Calhoun in a board

25   meeting.  And, you know, once again, the cursing and

1   the intimidation and the things that took place.

2        Q.   So that was going to be my first

3   question, was that your first written complaint to

4   the Board, the one that appears at Black Jack Fire

5   42?

6        A.   I label it as a formal complaint, I

7   don't know if it was the first, but I believe this

8   was the first time that I went in such great detail

9   explaining the irregularities and the things that

10  were taking place.

11       Q.   And that was going to be my next

12  question, because these are lengthy, they go into

13  great detail.  When you submitted this document to

14  the Board of Directors on October 17th, 2017, is it

15  safe to say that this touched on all the complaints

16  you had as of that date?  As of October 17 of 2017.

17       A.   No, it's not.  As I said before, this is

18  the most detailed and probably one of the larger

19  complaints and the most relevant.

20       Q.   What was not included in that letter

21  dated October 17 of 2017?  If you can recall.

22       A.   Reminding them of the previous

23  conversations that we would have in the board

24  meetings about responsibility and professionalism,

25  and things that can and cannot be said in board

PohlmanUSA Court Reporting (877) 421-0099

Page 225

```
 1                WITNESS SIGNATURE PAGE

 2    STATE OF            )

 3    COUNTY OF           )

 4

 5        I, ANKENETH CORBIN, do hereby certify:

 6        That I have read the foregoing statement;

 7    that I have made such changes in form and/or

 8    substance to the within statement as might be

 9    necessary to render the same true and correct;

10        That having made such changes thereon, I

11    hereby subscribe my name to the statement.

12        I declare under penalty of perjury that the

13    foregoing is true and correct.

14

15                       ANKENETH CORBIN

16

17        Executed this      day of

18        2024, at

19

20        My Commission expires:

21

22

23                       Notary Public

24

25
```

**KEN CORBIN**

**vs.**                    **CASE NO. 4:23-cv-00516-JAR**

**BLACK JACK FIRE PROTECTION DISTRICT AND DAVID CALHOUN, IN HIS INDIVIDUAL CAPACITY**

**DEPOSITION OF KENNETH SCHMALBECK**
**Taken February 28, 2024**

# CONFIDENTIAL TRANSCRIPT

**REPORTED BY KELLY L. GUILLIAMS, CCR**

**WROCKLAGE REPORTING, LLC**

**Certified Court Reporters**

**467 Brookfield Drive**

**Washington, MO  63090**

**(314) 249-4376 or (314) 210-6917**

**EXHIBIT  2**

KENNETH SCHMALBECK - 2/28/2024

```
 1  accurately?
 2        A     No.
 3        Q     And you understand you're under oath;
 4  correct?
 5        A     Yes.
 6        Q     And that you have the obligation to tell
 7  the truth just like if you were in court; correct?
 8        A     Correct.
 9        Q     And if you say you don't remember
10  something when in fact you do remember something,
11  that would be deceitful; correct?
12        A     Yes, sir.
13        Q     Okay.  And did you do anything to prepare
14  for this deposition today?
15        A     Not really.
16        Q     Did you look at any documents?
17        A     No.
18        Q     You meet with attorneys?
19        A     Yes.
20        Q     Okay.  When did you meet with your
21  counsel?
22        A     Was that Friday?  Thursday, Friday.  Last
23  week.
24        Q     And were you involved in collecting or
25  providing documents in response to a request for
```

KENNETH SCHMALBECK – 2/28/2024

```
 1   production in this case?
 2        A    No.
 3        Q    By whom are you currently employed?
 4        A    I am retired.
 5        Q    And what did you retire from?
 6        A    Boeing Company.
 7        Q    And what was your role with Boeing?
 8        A    I was a contract administrator.
 9        Q    And how long was your career at Boeing?
10        A    Thirty-three years.
11        Q    And when did you retire?
12        A    September the 22nd, 2009.
13        Q    Congratulations.  And then what's your
14   educational background?
15        A    I have a Bachelor's of Arts Degree in
16   business administration/economics.
17        Q    Where did you get that degree from?
18        A    University of La Verne.
19        Q    Wisconsin?
20        A    La Verne, California.
21        Q    Very good.  And do you currently hold a
22   role on the board -- well, let me back up.  Have you
23   ever held a role on the board for the Black Jack
24   Fire District?
25        A    Yes.
```

KENNETH SCHMALBECK - 2/28/2024

1       Q    And what was that role?

2       A    Director and firefighter.

3       Q    And when did you first become affiliated

4  with Black Jack Fire District?

5       A    November 24th, 1980.

6       Q    Very good.  Was that as a firefighter?

7       A    Yes.

8       Q    And was that paid or volunteer?

9       A    It was what they called auxiliary, which

10  is kind of a little less than a volunteer, but more

11  than a citizen.

12      Q    Very good.  And how long did you do that

13  for?

14      A    Six years and four months.

15      Q    And did -- were you provided -- had you

16  ever worked as a firefighter before that?

17      A    No.

18      Q    Did the district provide training?

19      A    Yes.

20      Q    And then when did you become elected to

21  the board?

22      A    In April of 1987.

23      Q    And you remained on the board until when?

24      A    April of 2023.

25      Q    And when you left, was that -- was that

KENNETH SCHMALBECK - 2/28/2024

1   voluntarily?

2        A    Yes.

3        Q    Did you just decide to retire from the

4   position?

5        A    Yes, sir.

6        Q    And during that time period from April '87

7   to April '23, there were elections every six years,

8   am I right about that?

9        A    That is correct.

10       Q    And you prevailed in all of those

11  elections?

12       A    Some of the elections, I was the only

13  candidate, and under Missouri law, I didn't have to

14  have an election, but yes.

15       Q    Occasionally, you were opposed?

16       A    Occasionally, I was opposed, occasionally,

17  I was not.

18       Q    And were you ever opposed by someone who

19  worked for the district?

20       A    No.

21       Q    Did it ever upset you that you were being

22  opposed in an election?

23       A    No.

24       Q    It's certainly to be expected; correct,

25  that you might be opposed?

**KENNETH SCHMALBECK – 2/28/2024**

1      A     That's why you have elections, because you

2  have people voting different ways.

3      Q     Of course.  And what was your compensation

4  for serving on the board at the time you retired in

5  April of '23, if you recall?

6      A     Say that again.

7      Q     Yeah.  So what was your compensation for

8  serving on the board at the time you retired?

9      A     By state law, it was limited to $10,600 a

10  year.

11      Q     And then did you also receive benefits

12  with that?

13      A     Not really.

14      Q     No health insurance?

15      A     I'm too old.

16      Q     Gotcha.  And how old are you?

17      A     Seventy-nine.

18      Q     What's your date of birth?

19      A     ███████████  Let's not get me too old.

20      Q     Hey, you're younger than Mick Jagger.

21      A     Everybody's younger than that.

22      Q     And did you ever have health insurance

23  through the board?

24      A     No.

25      Q     Did other board members do you know?

KENNETH SCHMALBECK – 2/28/2024

```
 1        A      Yes.

 2        Q      Who had health insurance?

 3        A      Don't know.

 4        Q      But you just know someone did?

 5        A      I know they did, and I know it's legal.

 6        Q      And for the last let's say four years of

 7   your term, you served with Orlando Smith and David

 8   Calhoun; correct?

 9        A      I'm trying to remember.  When did Orlando

10   come on?

11        Q      My -- my belief --

12        A      About four years ago.  Yeah, that's about

13   right.

14        Q      Okay.  And Orlando was the last member to

15   join of that trio of --

16        A      Yes.

17        Q      Yeah.  And who was there before Orlando?

18        A      Randy Adler.

19        Q      And why did Randy Adler leave?

20        A      Don't know whether he had any reasons.

21        Q      And when did you become acquainted with my

22   client, Ken Corbin?

23        A      During the process of hiring him as the

24   Assistant Chief.

25        Q      And do you remember about when that was?
```

KENNETH SCHMALBECK - 2/28/2024

1        A      No, sir.

2        Q      And do you remember if you recommended his

3    hire?

4        A      Highly.

5        Q      When you say "highly," why do you say

6    "highly"?

7        A      Because I liked him as one of the best

8    candidates we had for the position.

9        Q      And did his -- he was eventually promoted

10   to Chief from Assistant Chief; correct?

11       A      Yes, sir.

12       Q      So I -- can I deduct from that that his

13   performance as Assistant Chief was as positive as

14   you would have expected?

15       A      Yes.

16       Q      And was he promoted to Chief in about

17   2015, does that sound right?

18       A      Yeah, about.

19       Q      Okay.  What do you remember about that

20   process?

21       A      I'm not sure what you're asking.

22       Q      I mean do you remember if there were

23   interviews?

24       A      No, I don't think so.  The board knew he

25   was the Assistant Chief, and we were satisfied with

KENNETH SCHMALBECK - 2/28/2024

1    his performance at that point.

2         Q    And who was the Chief prior to Chief

3    Corbin?

4         A    Mike Gantner, Michael Gantner.

5         Q    And did Mr. Gantner retire?

6         A    Yes, he did.

7         Q    And do you remember his age at retirement?

8         A    Sixty.

9         Q    And did he retire due to the mandatory

10   retirement age in effect?

11        A    Yes.

12        Q    And is that -- that mandatory retirement

13   age, that's 60 years old; correct?

14        A    Yes, sir.

15        Q    And is that in effect for all fire

16   district employees?

17        A    Black Jack Fire District employees, yes.

18        Q    Yes.  Does that even include

19   administrative staff, if you know?

20        A    I don't remember.

21        Q    And do you remember any discussions with

22   Chief Gantner about keeping him on longer, extending

23   the mandatory retirement age for him?

24        A    I don't think we talked to him about that.

25        Q    Is it possible there were discussions?

**KENNETH SCHMALBECK – 2/28/2024**

1       Q    So are these pretty typical exemplars of

2  how the vacation and holiday pay buyback would

3  typically work at retirement?

4       A    Yes.

5       Q    And these are unsigned, but typically, at

6  least one member of the board would sign off on

7  these, would that be fair to say?

8       A    Yes.

9       Q    And has looking at this document refreshed

10 your recollection at all about Chief Gantner, if he

11 might have got a similar --

12      A    I would expect that he would have gotten a

13 similar one, we do that for our retirees, because

14 that's how it's authorized.  All bills are

15 authorized by the board.

16      Q    And this payout, it's pretty routine; fair

17 to say?

18      A    Oh, yeah.

19      Q    And Chief Corbin was ultimately

20 terminated; correct?

21      A    Yes, sir.

22      Q    And he was not offered this buyout;

23 correct?

24      A    Right.

25      Q    Was that because he was terminated?

KENNETH SCHMALBECK - 2/28/2024

```
1        A     Yes.
2        Q     And is it reasonable to assume that had he
3   reached retirement age and retired, he would have
4   gotten this -- this buyback?
5        A     He would have.
6        Q     And was Chief Corbin's compensation
7   changed at some point during his term that you
8   recall?
9        A     Yes.
10        Q     What do you remember about that?
11        A     He requested that we look at it, because
12   he wanted -- he felt that he deserved something in
13   relation to the market, and we reviewed it and
14   determined that he was correct and changed it,
15   changed his salary, which, by the way, also changed
16   every year.  Normally, it was in -- in the document
17   for more than one year.  We usually didn't write
18   them up for a single year at a time.
19        Q     But would it be something comparable to
20   cost of living type increases year to year?
21        A     I wouldn't call them that, but yeah,
22   similar.
23        Q     And do you remember what the numbers were
24   or the dates were when that --
25        A     No.
```

KENNETH SCHMALBECK – 2/28/2024

1      Q     Okay.  But my understanding is that --
2  that prior to the end of 2022, that Chief Corbin was
3  never put on a performance plan; correct?
4      A     Do what?  Say it again.
5      Q     Yeah.  Chief Corbin was never put on a
6  performance improvement plan; correct --
7      A     No.
8      Q     -- prior to the fall of 2022?  And prior
9  to the fall of 2022, Chief Corbin was never issued
10  any formal discipline; correct?
11      A     That's correct.
12      Q     And can you remember if he was ever
13  verbally counseled about his job performance prior
14  to the end of 2022?
15      A     We would talk to him about it to some
16  extent.
17      Q     Do you remember any of those
18  conversations?
19      A     No, sir.
20      Q     Is there anything that sticks out in your
21  mind as a big issue?
22      A     No.
23      Q     And prior to late 2022, do you remember --
24  do you recall any conversations between you and
25  other board members about potentially replacing

KENNETH SCHMALBECK - 2/28/2024

1  Chief Corbin?

2      A    No.

3      Q    And Chief Corbin raised a number of -- and

4  I'll provide you more details, but generally

5  speaking, Chief Corbin raised a number of complaints

6  with the board during the term of his employment, is

7  that fair to say?

8      A    Yes.

9      Q    And did that concern, irritate, or bother

10  either you or the other board members that you

11  recall?

12      A    No.

13      Q    And he continued raising various issues up

14  until the time he was suspended, is that fair to

15  say?

16      A    Yes.

17      Q    And the issues he complained of, do you

18  remember him complaining about race discrimination?

19      A    Yes.

20      Q    And do you remember him complaining about

21  potential malfeasance with respect to a vehicle

22  purchase?

23      A    No.

24      Q    Or the selling of a vehicle to David

25  Calhoun instead of -- at a below market rate, do you

KENNETH SCHMALBECK - 2/28/2024

```
 1   separate progressive discipline policy for

 2   supervisory employees?

 3        A     Not really.

 4        Q     And would you agree that progressive

 5   discipline is usually a good policy for an

 6   organization to follow?

 7             MR. ALLEN:  Objection, form.  You can

 8   answer.

 9        A     Is it a good policy.  I don't know.

10        Q     (By Mr. Hackney)  But the board tried to

11   follow progressive discipline where appropriate,

12   would that be fair to say?

13        A     Yes.

14        Q     Why was Chief Corbin fired?

15        A     My opinion, I had a reduced level of trust

16   in his actions.

17        Q     And when you say "his actions," does that

18   include some of these things he was bringing up --

19        A     No.

20        Q     -- as far as complaints?

21        A     No.  He's allowed complaints.  How else

22   will I know if something's going on?

23        Q     So what do you mean by that?

24        A     I mean that I've -- there seemed to have

25   been a reduction in his desire to give us
```

KENNETH SCHMALBECK – 2/28/2024

1    information and keep us informed.

2         Q    Can you think of any examples of that?

3         A    No, sir.

4         Q    And can you think of any other examples of

5    his actions that gave you concern?

6         A    No, not really.

7         Q    And is your -- your testimony about the

8    reason for Chief Corbin's termination, was that, as

9    far as your vote goes, that you had lost faith in

10   him?

11        A    That would be a way of saying it, yes.

12        Q    I'm going to show you what's been

13   previously marked as Plaintiff's 9.  Have you seen

14   this document before?

15        A    Yes.

16        Q    What are we looking at?

17        A    We're looking at the letter that we

18   prepared for his -- to notify him of his

19   termination.

20        Q    And I'll represent to you that in prior

21   depositions, we've determined that the date of

22   December 18th, 2023 at the top, that that is

23   incorrect.  Is that consistent with your memory?

24        A    Yes.

25        Q    And would the likely date of this letter

KENNETH SCHMALBECK - 2/28/2024

```
 1              MR. ALLEN:  Objection, form.  You can
 2   answer.
 3        A    Not that I can remember.
 4        Q   (By Mr. Hackney)  Was any discipline short
 5   of termination considered that you recall?
 6        A    No.
 7        Q    Did Director Smith seem reluctant to fire
 8   Chief Corbin?
 9        A    We were all reluctant to fire Chief
10   Corbin.
11        Q    Did -- of the three of you, was any one of
12   you more I'll say gung-ho about the termination than
13   the other two?
14              MR. ALLEN:  Objection, form.  Answer if
15   you can.
16        A    You're asking, of course, that I tell you
17   how I think somebody else was doing and you're only
18   asking my opinion, and I'm saying no, there was
19   nobody that was more eager than the others, because
20   none of us were.
21              MR. HACKNEY:  You want to do a short
22   break?
23              MR. ALLEN:  Yeah.
24          (Thereupon, a brief recess was taken.)
25        Q   (By Mr. Hackney)  Mr. Schmalbeck, you were
```

KENNETH SCHMALBECK - 2/28/2024

1        A     Secretaries.

2        Q     Speaking of which, did any secretaries

3    ever make any complaints about David Calhoun's

4    misconduct?

5        A     Not that I'm aware of.

6              MR. ALLEN:  And I'm going to object to the

7    form of that question.  Subject to that, you can

8    answer.

9        A     Not that I'm aware of.

10       Q     (By Mr. Hackney)  And in the body of this

11   charge, do you see Mr. Calhoun's name referenced a

12   few times?

13       A     I do.

14       Q     And is it your understanding that -- or

15   let me ask it this way.  Was it ever explained to

16   you by Chief Corbin or anyone else that Chief Corbin

17   had put a camera in his office to record David

18   Calhoun?

19       A     No.

20       Q     Did you ever see images of David Calhoun

21   in Chief Corbin's office?

22       A     Yes.

23       Q     When did you see those?

24       A     When Chief Corbin showed me.

25       Q     When was that?

KENNETH SCHMALBECK - 2/28/2024

 1       A    I'm thinking September, October, I don't

 2   remember for sure, of '22.

 3       Q    And earlier I believe you testified that

 4   the first time you had knowledge of a camera was in

 5   late December of '22, do you remember that?

 6       A    Yes.

 7       Q    So is that not quite accurate, that you

 8   had some knowledge before then?

 9       A    No, that is absolutely accurate.

10            MR. ALLEN:   Hang on, hang on.  I'm going

11   to object to the form of the question.  Subject to

12   that, you can answer.

13       A    Almost all of the computers in that office

14   had cameras for purposes of Zoom meetings, because

15   we were in COVID, and most of our meetings were held

16   by Zoom.  The camera we're talking about was

17   unknown.

18       Q    (By Mr. Hackney)  Okay.  Were Zoom meetings

19   sometimes recorded?

20       A    Only to transmit, not -- not to retain.

21   No -- no record copies were ever made.

22       Q    But temporary copies were made?

23       A    No.  The only thing the cameras were used

24   for was to use the Zoom software to transmit the

25   signal to somebody else.  If somebody else recorded

KENNETH SCHMALBECK - 2/28/2024

1      Q     Okay.  And does this help refresh your

2  recollection about what might have been discussed on

3  November 16th?

4      A     No.

5      Q     And this letter is addressed to Chief

6  Corbin; correct?

7      A     Correct.

8      Q     Do you know how it was delivered to him?

9      A     No.

10     Q     And this references bringing a third-party

11  representative to the meeting; correct?

12     A     Yes.

13     Q     Does that suggest that there -- that this

14  is a disciplinary meeting?

15          MR. ALLEN:  Objection, form.  Answer if

16  you can.

17     A     Cannot.

18     Q    (By Mr. Hackney)  Do you remember what

19  happened on December 6?

20     A     Pretty much.

21     Q     What do you remember about that meeting?

22     A     Well, I remember that the Chief was -- did

23  not bring a representative with him as his choice

24  was made to not do that and that we started to ask

25  some questions with regard to some things that had

KENNETH SCHMALBECK – 2/28/2024

1    been going on in the district, the specifics, I

2    don't know which, and the meeting proved to be

3    fruitless.

4         Q    In what way?

5         A    No answers.

6         Q    And was the camera a topic of discussion?

7         A    We didn't know about the camera until late

8    December.

9         Q    Or the recording I should say, recording

10   of David Calhoun or anyone else, was that a topic of

11   conversation?

12        A    Very likely.

13        Q    Did Mr. Bruntrager speak at this meeting

14   on December 6th?

15        A    Yes.

16        Q    Do you remember anything that he said?

17        A    Not any of the details, no.

18        Q    Did you ever overhear Mr. Bruntrager

19   discourage Chief Corbin from pursuing any charges of

20   discrimination?

21        A    No.

22        Q    Did he ever -- strike that.  Do you

23   remember whose idea it was to suspend Ken Corbin?

24        A    Mine.

25        Q    And do you remember when you made that

KENNETH SCHMALBECK - 2/28/2024

 1  decision?

 2       A    At the meeting.

 3       Q    At that same meeting we were just talking

 4  about?

 5       A    The one in December or late December when

 6  we actually issued the suspension.

 7       Q    And what was the reason you suggested

 8  suspension?

 9       A    There was a lot of discussion with regard

10  to the next actions we were going to take, and the

11  most logical thing was to have the Chief not in the

12  building.  But under no circumstances did I want to

13  suffer his -- his financial position, so I suggested

14  that we do it with -- with full pay.

15       Q    And what conduct was the cause of the

16  suspension?

17       A    The fact that we had had the situation and

18  done December 6th and still didn't have any answers,

19  and we had the situation with the pictures of the

20  taping, videotaping of people in the office, which

21  was a normal thing to happen, I'd go in on weekends,

22  because that's where our mailboxes are.  So if we

23  wanted to get our mail, we had to go in there.

24       Q    And when you say no answers were given in

25  that December 6 meeting, answers to what, what

```
 1                  WITNESS SIGNATURE PAGE

 2

 3      I, ORLANDO SMITH, hereby acknowledge that I

 4   have read the foregoing transcript of my deposition

 5   testimony, given on the 28th day of February, 2024,

 6   by affixing my signature hereto.

 7

 8                           _____

 9                           KENNETH SCHMALBECK

10

11      Subscribed and sworn to before me this _____

12   day of _____, A.D., 2024.

13      MY COMMISSION EXPIRES: _____

14

15                           _____

16                           Notary Public, within and for

17                           the State of Missouri

18

19

20

21

22

23

24

25
```

**KEN CORBIN**

**vs.**                      **CASE NO. 4:23-cv-00516-JAR**

**BLACK JACK FIRE PROTECTION DISTRICT AND DAVID CALHOUN, IN HIS INDIVIDUAL CAPACITY**

**DEPOSITION OF DAVID CALHOUN**

**Taken February 22, 2024**

# CONFIDENTIAL TRANSCRIPT

**REPORTED BY KELLY L. GUILLIAMS, CCR**

**WROCKLAGE REPORTING, LLC**

**Certified Court Reporters**

**467 Brookfield Drive**

**Washington, MO  63090**

**(314) 249-4376 or (314) 210-6917**

**EXHIBIT  3**

DAVID CALHOUN - 2/22/2024

1   background?

2        A    A Bachelor's of Science in education.

3        Q    And where did you get that degree from?

4        A    Central State University, Wilberforce,

5   Ohio.

6        Q    What year did you graduate?

7        A    Summer of '92.

8        Q    And do you have any certifications or

9   licenses with respect to your trade?

10       A    Yes, sir.

11       Q    What do you have?

12       A    I'm a licensed welder, certified welder,

13  certified in medical gas, certified backflow, have

14  license to work in St. Louis City and St. Louis

15  County.  I also have nuclear clearance by the

16  Nuclear Regulation Committee.

17       Q    And what are your -- do you have some

18  relationship with the Black Jack Fire District?

19       A    I'm a board of director.

20       Q    And what does that mean?

21       A    We oversee the district as far as

22  finances.

23       Q    And how did you come to hold that

24  position?

25       A    I was appointed.

DAVID CALHOUN - 2/22/2024

1        Q     Who appointed you?

2        A     Randy Adler and Ken Schmalbeck.

3        Q     When did that happen?

4        A     February 2011.

5        Q     And do you remember how you first became

6   aware of the opportunity?

7        A     Yeah, I was at a North County Labor Club

8   meeting.

9        Q     And what happened at that meeting?

10       A     Sylvester Taylor said he was stepping

11  down.

12       Q     And Sylvester Taylor, that was a board

13  member --

14       A     Yes.

15       Q     -- prior to you?  Okay.  Do you know why

16  he stepped down?

17       A     He became a state rep.

18       Q     And so was there a interview process that

19  you went through do you recall?

20       A     Yes.

21       Q     Describe that for me, if you would.

22       A     I was going to the meetings and they

23  observed me, the two current board of directors and

24  the shop steward.  Those guys interviewed me.

25       Q     And you've never worked as a firefighter;

DAVID CALHOUN - 2/22/2024

1   similar to the Chief's responsibilities; correct?

2        A    Correct.

3        Q    And so there's been one termination that

4   you recall.  Can you recall any time that the board

5   has had to impose discipline on anyone besides

6   Mr. Corbin?

7             MR. ALLEN:  Are you talking about only

8   during the period of time he's been on the board?

9             MR. HACKNEY:  Correct.

10       A    Not off the top of my head, Jeff.

11       Q   (By Mr. Hackney)  Okay.  And prior to

12  Mr. Corbin's termination, do you recall if he was

13  ever subjected to any sort of discipline?

14            MR. ALLEN:  Objection, form.  You can

15  answer.

16       A    No, sir.

17       Q   (By Mr. Hackney)  Do you know if there's

18  any kind of policy -- when I say "progressive

19  discipline," do you understand what that means?

20       A    Kind of.

21       Q    And I'll sort of define how I'm using it,

22  which is that you have disciplinary steps leading up

23  to termination, and that might take the form of a

24  verbal warning, a written warning.  Do you know of

25  any kind of progressive discipline, as I'm talking

**DAVID CALHOUN - 2/22/2024**

1       Q     And 2010, that would be before you were on

2 the board; is that right?

3       A     Yes, sir.

4       Q     So what was your involvement in that?

5       A     I was attending the meetings.

6       Q     And why were you attending the meetings?

7       A     In anticipation of trying to become a

8 board of director.

9       Q     Gotcha.  So you were attending, but you

10 didn't participate in that; fair to say?

11       A     Yes, sir, fair to say.

12       Q     And would you characterize your

13 relationship at that time with Ken as cordial,

14 friendly?

15       A     Yes.

16       Q     And do you remember when Ken was made

17 Chief?

18       A     I think it was late 2010.  Don't know

19 exactly what month.

20       Q     And I believe it was more --

21       A     No, not Chief, he was -- no, he became

22 Chief probably in 2015.  I don't know what -- I

23 think June, May or June, something like that.

24       Q     Okay.  And how did he come to be appointed

25 Chief?

DAVID CALHOUN - 2/22/2024

```
 1       A    Three directors appointed him unanimously.

 2       Q    Were there any other candidates

 3  considered?

 4       A    Yes.

 5       Q    Do you remember who any of those were?

 6       A    Keith Goldstein.

 7       Q    And who's Keith Goldstein?

 8       A    He was a Battalion Chief at the time.

 9       Q    And what's your understanding as to what

10  the responsibilities of the Chief are?

11       A    They run the fire service day-to-day

12  operation.

13       Q    And what does that entail?

14       A    Running the day-to-day operation, making

15  sure everything goes smooth.

16       Q    And does the Chief have concern -- any

17  budgetary responsibilities?

18       A    Yes.

19       Q    What are those?

20       A    He oversees the budget of the district.

21       Q    Do you have any understanding as to how

22  Chief Corbin performed with respect to the budget

23  over his term as Chief?

24            MR. ALLEN:  Objection, form.  You can

25  answer.
```

## DAVID CALHOUN - 2/22/2024

1    Q    But you don't remember who that was that
2  said that?
3    A    Yes, sir, I remember.
4    Q    Who's that?
5    A    Ken Corbin recommended that I get on the
6  insurance.
7    Q    And do you remember the context in which
8  that came up, do you remember anything else about
9  that conversation?
10    A    No, sir.
11    Q    Okay.  Do you remember any discussions
12  with Ken about whether the insurance be -- that you
13  were taking advantage of through the board, whether
14  it was appropriate or whether it was ethical, do you
15  remember any conversations about that?
16    A    Yes, sir.
17    Q    Tell me about that.
18    A    Well, when he got mad at me, that's when
19  it became unethical.
20    Q    When did he get mad at you?
21    A    When I didn't go by his rules.
22    Q    What time frame are we talking about?
23    A    Probably from the time I became a board
24  member, 2011, to 2017.
25    Q    So did your relationship with Ken

1    deteriorate around 2017, is that fair to say?

2         A    Yes.

3         Q    And is your testimony that that was

4    because you weren't following his rules, did I -- am

5    I understanding that right?

6         A    Yes.

7         Q    What rules are you referencing there?

8         A    The things that I was seeing that he was

9    doing and I was telling him about it, he didn't like

10   that.

11        Q    Okay.  Was that -- were you criticizing

12   his job performance, what are we talking about?

13        A    His absentee.

14        Q    And tell me more about that.

15        A    Absentee.

16        Q    And so he was -- he was missing too many

17   days of work; is that right?

18        A    Yes, sir.

19        Q    And how many days was he missing?

20        A    A lot.

21        Q    Do you know why he was missing days?

22        A    I can speculate, but no, I don't know why.

23        Q    Did he tell you why he was missing days?

24        A    No, sir.

25        Q    Did he -- did he deny that he was missing

DAVID CALHOUN - 2/22/2024

```
1        Q    And do you remember the -- any responses
2   that you got or the types of responses?
3        A    Yes.
4        Q    Tell me about that.
5        A    At home with his kid.
6        Q    And did you ask Chief Corbin if he was
7   home with his kid?
8        A    No, sir.
9        Q    And Chief Corbin has a child with autism;
10  correct?
11       A    Yes, sir.
12       Q    And is your understanding that it was
13  because his child required additional care that he
14  was away sometimes?
15       A    No, sir.
16       Q    Do you have any understanding about why he
17  would simply stay home?
18       A    No, sir.
19       Q    And so if I understand, the deterioration
20  in your relationship between you and Chief Corbin in
21  2017 that we talked about earlier, that that turned
22  upon -- just for sake of clarity, that turned upon
23  you confronting him about being away too much;
24  correct?
25            MR. ALLEN:  Objection, form.  You can
```

## DAVID CALHOUN - 2/22/2024

```
1  answer.
2       A    There was other reasons why too.
3       Q    (By Mr. Hackney)  What are some other
4  reasons?
5       A    Because I challenged him on him using a
6  district credit card to buy his lunch every day and
7  doing various things like that.
8       Q    And what's the policy on using a district
9  card to pay for lunch?
10      A    Ethical is a policy, Jeff.  We know right
11 from wrong.
12      Q    Is there anything in writing about card
13 use?
14      A    No, sir.
15      Q    And what did Chief Corbin say when you
16 confronted him about the card use for lunch?
17      A    I never said nothing to him about it at
18 that particular time.
19      Q    Did you ever say anything to him?
20      A    We talked about it later on in his office
21 just talking about other stuff.
22      Q    Do you know when that was?
23      A    No, sir.
24      Q    In roughly 2020, did Chief Corbin's
25 compensation change?
```

DAVID CALHOUN - 2/22/2024

```
 1        A    I'm not sure when it changed, Jeff.   I
 2   want to say that sounds about right.
 3        Q    And his compensation went up at that time?
 4        A    If it changed, it had to go up, yes, sir.
 5        Q    Do you remember the numbers, what he was
 6   making before, what he was making after?
 7        A    No, sir.
 8        Q    But you had conversations with Chief
 9   Corbin about that compensation issue; correct,
10   around that time in 2020?
11        A    Don't remember.
12        Q    It's possible you did?
13        A    I'm not sure, don't remember.
14        Q    Do you ever remember telling him that he
15   wasn't going to get a contract?
16        A    No, sir.
17        Q    Did you vote on whether he -- Chief Corbin
18   should get a pay raise or not?
19        A    Yes, sir.
20        Q    What was your vote?
21        A    Yes, unanimous.
22        Q    Okay.  So even though he was -- according
23   to your testimony had excessive absenteeism, you
24   voted to raise his pay; correct?
25        A    Yes, sir.
```

DAVID CALHOUN - 2/22/2024

```
 1      Q    And even though he was, according to your
 2  testimony, inappropriately using a credit card, you
 3  voted to increase his compensation; correct?
 4      A    Yes, sir.
 5      Q    Okay.  Why is that?
 6      A    Thought it was the right thing to do.
 7      Q    You felt he deserved it?
 8      A    Yes, sir.
 9      Q    Okay.  I'm going to show you what I'm
10  going to mark as Plaintiff's 1.  Have you ever seen
11  this document before?
12      A    Yes, sir.
13      Q    What are we looking at here?
14          MR. ALLEN:  I'll just object to the form,
15  calls for speculation.  Answer to the extent you
16  can.
17      A    A Charge of Discrimination document.
18      Q   (By Mr. Hackney)  Was this filed by
19  Mr. Corbin?
20          MR. ALLEN:  Objection, form, calls for
21  speculation.  Answer if you can.
22      A    That's his name up here, yes, sir.
23      Q   (By Mr. Hackney)  And in your duty -- and
24  this -- the lower left-hand corner, it indicates
25  this was filed July 26, 2019; correct?
```

DAVID CALHOUN - 2/22/2024

```
1         A    Yes.
2         Q    And in your duties as a board member, did
3    you become aware of this charge in 20 -- in the year
4    2019?
5         A    Yes.
6         Q    And there was discussion among the board
7    members regarding this charge; correct?
8         A    It was attorney/client privilege, sir.
9         Q    What do you mean by that?
10        A    I'm not allowed to talk on that, sir.
11        Q    Okay.  Are you saying that you discussed
12   this charge with counsel for the district?
13             MR. ALLEN:  And let me just be clear about
14   this.  I'll allow you to answer that question.  I do
15   not want you to answer any questions that require
16   you to divulge communications with your attorney,
17   but you can answer that question.
18        A    Can you repeat that?
19        Q    (By Mr. Hackney)  Sure.  So are you telling
20   me that the discussions you had about this charge
21   were with counsel for the board, counsel for the
22   district?
23        A    Both.
24        Q    And were there also discussions about this
25   charge among the board members without counsel
```

**DAVID CALHOUN - 2/22/2024**

1    Q    Okay.  And you testified earlier you were

2  never interviewed about the allegations in the

3  letter; correct?

4    A    I want to correct that.  I was

5  interviewed, I just don't remember what the

6  interview was about.

7    Q    Okay.  So you don't remember what the

8  interview was about, but you were interviewed.  Can

9  you elaborate?

10    A    I remember the subject, but I don't

11  remember every word that was said, that was between

12  the client and I -- I mean our attorney and I.  I

13  was interviewed about it though, yes, Jeff.

14    Q    And Mr. Bruntrager interviewed you?

15    A    Yes.

16    Q    And do you have any further recollection

17  of that interview?

18    A    No, sir.

19    Q    Do you know -- do you know if any --

20  strike that.  Do you know anything else that was

21  done with regard to investigation of the allegations

22  in the letter?

23    A    I can't recall.

24    Q    Okay.  When's the first -- at some point

25  along this timeline, prior to Chief Corbin's

DAVID CALHOUN - 2/22/2024

1 termination in December of 2022, was there -- do you

2 recall any discussion about needing to get a new

3 Chief or look for a new Chief?

4      A    No, sir.

5      Q    The topic never came up?

6      A    Not with me, sir.

7      Q    Okay.  I'm going to hand you what I've

8 marked as Plaintiff's 5.  Have you ever seen this

9 document before?

10      A    Yes, I have.

11      Q    And what is this?

12      A    Charge of Discrimination.

13      Q    And this was filed by Mr. Corbin?

14      A    Chief Corbin.

15      Q    Okay.  And the date indicates July 19th,

16 2022 in the lower left-hand corner?

17      A    Yes.

18      Q    Do you remember when you first saw this?

19      A    It had to be around the date that it was

20 mailed to us I think.

21      Q    And could that have been August of '22?

22      A    I can't recall, Jeff.

23      Q    And when this was received in the mail,

24 what discussions do you remember about it?

25      A    We got our attorney involved.

## DAVID CALHOUN - 2/22/2024

 1        Q    And have you seen this before today?

 2        A    Yes.

 3        Q    Do you remember when you saw this?

 4        A    No, sir.

 5        Q    Would it -- would it have been mailed --

 6    would you have seen it when it was mailed to the

 7    board by the EEOC?

 8        A    Yes.

 9        Q    Okay.  And so that would likely have been

10    in the late summer, early fall of 2022; correct?

11        A    Yes.

12        Q    And this charge alleges that -- if you

13    look at the third sentence, it says, "Since filing

14    my charge, Mr. Calhoun has been showing various

15    employees my original charge at the station,

16    petitioning firefighters to file a vote of no

17    confidence against me to get me fired."  Did I read

18    that correctly?

19        A    Yes.

20        Q    And did you show Chief Corbin's original

21    charge, Plaintiff's 5, to anyone?

22        A    No.

23        Q    And were you ever asked if that was true?

24        A    Asked if what was true?

25        Q    In other words, was this allegation

DAVID CALHOUN - 2/22/2024

1  pipefitter, I'm a firefighter.  I don't know your

2  job, you don't know my job."  That's exact words

3  quote unquote.  I said, "Well, help me learn your

4  job."

5       Q    When was that conversation?

6       A    Back in 2016, 2017, 2018, 2019, 2020,

7  2021, 2022.

8       Q    So it's your testimony that he said -- he

9  made comments to the effect of "I'm a firefighter,

10  you're a pipefitter" repeatedly?

11       A    Yes, every time.

12       Q    Okay.  When did you become aware -- well,

13  let me establish a foundation.  Did you become aware

14  at a certain point in time that Chief Corbin had a

15  camera in his office?

16       A    Maybe it was the Tuesday before a board

17  meeting.

18       Q    Do you remember what -- you know, what

19  month we're talking about?

20       A    Not offhand.

21       Q    Or --

22       A    So if -- that picture you got, what's the

23  date on that picture you got?

24       Q    Yeah, and I'll go ahead and make this an

25  exhibit, which I think I'm up to 8.

DAVID CALHOUN - 2/22/2024

```
 1   I noticed that's what that was.
 2         Q     Okay.  So --
 3         A     The only reason why I can tell you what
 4   that is, because I can see the lines on there, and
 5   that look like one of the sheets we have for the
 6   guy's name and address on it, their phone number.
 7   I'm not a hundred percent sure, but that's what that
 8   looks like to me, Jeff.
 9         Q     Gotcha.  So looking at the date, does that
10   help refresh your recollection any about when you
11   might have found out Chief Corbin had a camera?
12         A     Probably it was around October.  This is
13   September.  It probably was around October.
14         Q     Okay.  And how did you feel -- well, let
15   me back up.  How did you find that out?
16         A     I got a phone call at work.
17         Q     From who?
18         A     From a citizen, Addington Stewart, who
19   Chief Corbin called prior.
20         Q     And what did Addington Stewart say?
21         A     That he just got a phone call from Ken
22   saying that I was in his office rifling through his
23   drawer, I was on the other side stealing out of the
24   closet where the guys keep their things at like
25   water, juice, sugar, and all that thing.
```

DAVID CALHOUN - 2/22/2024

1           And I said, "What?"  And the way it was

2     explained to him was I broke in his office.  I don't

3     know if that's how he got the story, but that's how

4     he explained it to me, so yeah.

5           Q     Okay.  And what was your reaction to

6     hearing this?

7           A     I said, "That's not true."  I said, "Yeah,

8     I was in his office, but I didn't rifle through his

9     drawers."

10          Q     And after that call -- how long did that

11    call last, do you know?

12          A     Probably about five or 10 minutes.

13          Q     Have you told me everything significant

14    that you remember about that call?

15          A     Well, Addington just reprimanded me, he

16    reamed me, because he said if I'm living in a glass

17    house throwing stones, I need to be held accountable

18    if I'm in there taking stuff.  I said, "Taking

19    what?"  He said, "If you in there stealing stuff out

20    of that firehouse, you need to be held accountable

21    for that."

22          Q     And after that call, what did you do?

23          A     Well, during the call, I said, "I'm not

24    stealing anything in there."  I said, "I want them

25    to prove that I was stealing something."  He said,

DAVID CALHOUN - 2/22/2024

1    any rule about cameras in offices; correct?

2            MR. ALLEN:  The answer to your question

3    was "I don't know."

4        A    I don't know.

5        Q    (By Mr. Hackney)  You don't know if you can

6    or not?

7        A    Yes, I don't know if you can or not.

8        Q    So you might -- you might be able to

9    identify a rule right now, you're just not sure if

10   you can or not?

11       A    I couldn't answer that.

12           MR. ALLEN:  Objection, form.  Answer if

13   you can.

14       A    I can't answer that, Jeff, I don't know

15   the answer to that one.

16       Q    (By Mr. Hackney)  Let me try it this way.

17   You cannot cite any -- any rule about having a

18   camera in an office; correct, yes or no?

19       A    No, I can't.

20       Q    Okay.  Thank you.  Who made the decision

21   to fire Ken Corbin?

22       A    That was determined by the board.

23       Q    And it was a three to nothing vote;

24   correct?

25       A    Yes, sir.

DAVID CALHOUN - 2/22/2024

```
1   other things, you to return certain property

2   belonging to the district you had received during

3   your employment."  Did I read that correctly?

4        A    Yes.

5        Q    Okay.  What is that referring to?

6        A    I want to say it's electronic devices.

7        Q    And why was Chief Corbin asked to return

8   those things?

9        A    So it could be investigated.

10       Q    And was this a disciplinary suspension, is

11  that the context he was asked to return them?

12       A    Yes.

13       Q    And why was he under a disciplinary

14  suspension?

15       A    To investigate the issue with the cameras.

16       Q    And that's the only reason he was on

17  disciplinary suspension; correct?

18       A    Yes.

19       Q    And what was he asked to hand back?

20       A    All electronic devices.

21       Q    And what electronic devices did he have?

22       A    Cell phones, computers, laptops.

23       Q    Do you know how many?

24       A    Many cell phones, a couple computers.

25       Q    Who told Chief Corbin he was being put on
```

**DAVID CALHOUN - 2/22/2024**

```
 1        A     Yes and no.
 2        Q     Well, didn't -- so he returned at least
 3   some things, but the belief of the board was that it
 4   wasn't everything, am I understanding that
 5   correctly?
 6        A     Yes, it wasn't everything.
 7        Q     Okay.  But as you sit here, you're not
 8   able to identify what was missing; correct?
 9        A     Cell phone was missing.
10        Q     And he had -- you testified that he had
11   multiple cell phones?
12        A     Yes, sir.
13        Q     How many cell phones did he return?
14        A     He returned one.
15        Q     And how many more were there?
16        A     He still was using his communication
17   device.
18        Q     What does that mean?
19        A     He still had access to call you, and we
20   had a phone in our possession, so it wasn't the
21   phone that he was using that he turned in.
22        Q     So it's your understanding that Chief
23   Corbin, every phone he had was property of the
24   district, that he didn't have a personal phone that
25   was just his?
```

DAVID CALHOUN - 2/22/2024

1    A    Yes, sir.

2    Q    Okay.  And is this in reference to a

3  pending FMLA request that Chief Corbin was pursuing?

4    A    I'm not sure, sir.

5    Q    Do you know what this is in reference to?

6    A    Not directly, but -- not right offhand.

7    Q    Was this a -- was this one of the reasons

8  why Chief Corbin was fired?

9         MR. ALLEN:  Objection, form, but answer if

10  you can.

11   A    No, sir.

12   Q    (By Mr. Hackney)  Okay.  So are the two

13  reason -- was Chief Corbin fired for two reasons,

14  and those being having a camera in his office and

15  not handing over in the board's belief all his

16  devices when asked to do so, are those the two

17  reasons why Chief Corbin was fired?

18   A    Yes.

19   Q    Has anyone else to your knowledge while

20  you've been on the board ever been placed under

21  disciplinary suspension?

22   A    No, sir.

23   Q    The board considered the possibility that

24  Chief Corbin's camera might have something to do

25  with his charges; correct?

DAVID CALHOUN - 2/22/2024

1  observed firefighters taking videos on their phone

2  at work; correct?

3       A    No, sir.

4       Q    You've never seen them take a video of

5  training?

6       A    I haven't.

7       Q    Okay.  Or take photographs in the

8  workplace, you've never seen that?

9       A    No, sir.

10      Q    Is taking a photograph at work, is that

11  something someone would be disciplined for?

12      A    Not to my knowledge.

13      Q    Okay.  Was there an electronic sweep done

14  of the premises looking for surveillance devices?

15      A    Yes, sir.

16      Q    Tell me about that.

17      A    I wasn't part of that investigation, but

18  there was one done.

19      Q    Okay.  And the result of that was that

20  they did not find any recording devices; correct?

21      A    That's not true.

22      Q    What did they find?

23      A    They found recording devices in there.

24      Q    What kind of devices?

25      A    I don't know exactly what they were, but

DAVID CALHOUN - 2/22/2024

1  that's a serious decision; correct?

2      A    Yes, sir.

3      Q    And it should be taken with the utmost

4  care and due diligence; correct?

5      A    Yes, sir.

6      Q    And everything should be taken into

7  consideration; correct?

8      A    Yes, sir.

9      Q    But as you sit here today, you cannot

10  recall details about what this sweep found in terms

11  of recording devices; correct?

12      A    No, we couldn't.

13      Q    So you couldn't what?

14      A    We couldn't determine what was recorded.

15      Q    Okay.  So the results of the sweep were

16  really inconclusive; fair to say?

17      A    Yes, because we couldn't find out what was

18  recorded, yes.

19      Q    And have you made any attempt to

20  communicate with Ken Corbin's family, his wife,

21  after his termination?

22      A    No, sir.

23      Q    Okay.  I think that's all I have subject

24  to any Recross.  Do you have anything?

25          MR. ALLEN:  I have nothing, and we will

DAVID CALHOUN - 2/22/2024

```
 1              WITNESS SIGNATURE PAGE

 2

 3        I, DAVID CALHOUN, hereby acknowledge that I

 4   have read the foregoing transcript of my deposition

 5   testimony, given on the 22nd day of February, 2024,

 6   by affixing my signature hereto.

 7

 8                          _____

 9                          DAVID CALHOUN

10

11        Subscribed and sworn to before me this _____

12   day of _____, A.D., 2024.

13        MY COMMISSION EXPIRES: _____

14

15                          _____

16                          Notary Public, within and for

17                          the State of Missouri

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

# BLACK JACK FIRE PROTECTION DISTRICT

| Board of Directors | Fire Chief | Battalion Chiefs |
|---|---|---|
| Randolph E. Adler, *President* | Ankeneth Corbin | David P. Schmidt |
| David Calhoun, *Secretary* | Assistant Fire Chief | Thomas Torminio |
| Kenneth G. Schmalbeck, *Treasurer* | Roger A. Ellison | David J. Parker |

October 17, 2017
To: Board of Directors

I Ankeneth Corbin Fire Chief of the Black Jack Fire Protection District am filing a formal complaint with the Board of Directors of the Fire District, specifically against Board Secretary David Calhoun. Mr. David Calhoun has created a hostile work environment for me by his continuous display of the threatening, intimidating and abusive language towards me, the other board members and the employee group. Mr. Calhoun's recent outburst and repeated interference with the daily operations of this fire district has created a cause for concern among staff, myself, and employees of the Fire district and some of our vendors.

Mr. Calhoun's most recent verbal attack and rant took place at the closed session with meeting on October 10, 2017 while discussing the hiring of a full time administrative assistant.
After I had responded to several questions pertaining to the hiring of the full-time administrative assistant in a professional manner, Mr. Calhoun stated that we don't need no two full-time secretaries here. That's is what's wrong with this Fucking place, we got five people sittin over here on this side doing shit.
To which I replied, which five people are you talking about?
Mr. Calhoun stated I don't need to name them.
So, I asked again. What five people are you talking about?
Again Mr. Calhoun again refused to name the individuals stating that he did not have to name them, and asked If I had a guilty conscious?

To which I replied no, but if you're stating that there are five employees on the administration side that don't do anything, either you're saying that I'm one of the individuals, or that there are five employees under my supervision that don't do their jobs.

This conversation carried on for several exchanges and ultimately ended in Mr. Calhoun telling me that I was barking up the wrong tree.
I replied that I was not Barking. Board chairman Randy Adler spoke out and ask both parties to calm down.

**EXHIBIT 4**

5675 North Highway 67, Florissant, Missouri  63034
Phone: (314) 741-9905

Serving The Community Since 1929

www.blackjackfire.org

**BLACK JACK FIRE 000042**

My attempt to establish and maintain a professional working relationship with Mr. Calhoun have proven to be futile. Mr. Calhoun's frequent visits to the fire houses and the solicitation of opinions from individuals pertaining to operational procedures who are not part of the management staff are highly irregular by a Board of Director and counterproductive. These frequent visits to the stations have presented multiple challenging obstacles in the day-to-day operation of the fire district.

One example would be Mr. Calhoun calling me after business hours in the late evening to discuss staffing and stations assignments for the following year. He mentioned moving Two specific employees from house number two, because they been stationed there for multiple years and he feels that they are hiding.

I explained to Mr. Calhoun that this was an operational issue, and that in a meeting with the Chief Officers and the Assistant Chief of Operations, the capabilities of those individuals had been taken into consideration when discussing the upcoming assignments and rotation. I explained to Mr. Calhoun that operational issues are usually left to the discretion of the Fire Chief and the Assistant Chief.
This Conversation left me with a feeling of discomfort and confused as to why a director would specifically ask about two individuals and insist they be moved to a busier engine house.

The previous Administrative Secretary would meet Mr. Calhoun on weekends to sign board minutes. She would frequently share concerns with Mr. Calhoun that would later manifest in board meetings. I suggested leaving the minutes in the director's mail box in the Chiefs office so they can be retrieved at his leisure, as he routinely does. I maintain that the only time that an Administrative Assistant be contact on a weekend or after hours to meet any Director would be in extreme or emergency circumstances.

On a separate occasion after returning to the engine house and asking Battalion Chief Torminio if he had given the admin assistants permission to close the office early? Battalion Chief Torminio replied that Mr. Calhoun told them they could leave early. While battalion Chief and I had no issue with the Board of Director extending this courtesy, we both felt that as a courtesy to the Chief Officers that we would've been informed prior to making that decision.

During several conversations with our broker which handles property and casualty, health insurance and other services to discuss renewal and rates, several issues of concern were expressed by the broker pertaining to the personal phone calls to different managers and specific request made by Director Calhoun.

BLACK JACK FIRE 000043

CONFIDENTIAL

Several parties have expressed a concern of feeling pressured to make exceptions on Mr. Calhoun's behalf and stated that they were made to feel that the account was in jeopardy if they did not appease him. Alleged that Mr. Calhoun made several comparisons to our previous broker.

Please see the attached document dated June 28, 2016 from Kevin Cunneen to Judy Coleman and signed by me approving one such exception after repeated request and inquiries by Director Calhoun. Several managers have indicated that they have agreed in house to only communicate with him by email so that there's no confusion during communications as to what has been stated or explained. In addition to allegations of personal request to attend sporting events were also made.

Gentlemen I must implore you as Chairman and Treasurer of the Board that you guide and assist Board Secretary David Calhoun in his understanding of procedures, conduct and professionalism in dealing with the public, vendors and employees of the Black Jack Fire Protection District.

I appreciate your time and attention to this matter, and I hope that we can reach a conducive resolution that assures the continued success and progress of this organization.

Respectfully

Ankeneth Corbin
Fire Chief

cc: Daniel Bruntrager
    District Counsel

**KEN CORBIN**

**vs.**                    **CASE NO. 4:23-cv-00516-JAR**

**BLACK JACK FIRE PROTECTION DISTRICT AND DAVID CALHOUN, IN HIS INDIVIDUAL CAPACITY**

**DEPOSITION OF ORLANDO SMITH**

**Taken February 26, 2024**

# CONFIDENTIAL TRANSCRIPT

**REPORTED BY KELLY L. GUILLIAMS, CCR**

**WROCKLAGE REPORTING, LLC**

**Certified Court Reporters**

**467 Brookfield Drive**

**Washington, MO  63090**

**(314) 249-4376 or (314) 210-6917**

**EXHIBIT  5**

ORLANDO SMITH - 2/26/2024

```
 1        A    Yes.
 2        Q    And when are you up again for election or
 3   reappointment?
 4        A    I believe it will be next year.
 5        Q    Do you know which month?
 6        A    April.
 7        Q    So do you think you probably started in
 8   April of '19?
 9        A    That sounds about right.  Either '18 or
10   '19, one or the other.  It's a six-year term, so...
11        Q    Gotcha.  And were you elected?
12        A    Yes.
13        Q    And what made you start -- you know, what
14   was -- what made you decide to run for the board in
15   Black Jack?
16        A    A friend of mine named Sylvester Taylor.
17        Q    Okay.  He thought you might be a good fit
18   for it?
19        A    Yes.
20        Q    And Sylvester Taylor, is he employed by
21   Black Jack?
22        A    No.
23        Q    Was he just a citizen?
24        A    Yes.
25        Q    And did you run against someone?
```

1    2021 at a board meeting; correct?

2        A    Yes.

3        Q    Do you remember that meeting?

4        A    Yes, I believe so.  There was a lot of

5    meetings that --

6        Q    Sure.

7        A    -- those two would get into it.

8        Q    So it was not uncommon for them to have

9    arguments at board meetings?

10       A    Yeah, it was uncommon, but they would get

11   into it, not every single time --

12       Q    Sure.

13       A    -- but, you know, yeah.

14       Q    Okay.  And fair to say that Mr. Calhoun

15   and Mr. Corbin didn't get along very well?

16       A    It appeared.

17       Q    And did it seem to you that Mr. Calhoun

18   didn't like Mr. Corbin very much?

19            MR. ALLEN:  Objection, form.  You can

20   answer.

21       A    I don't know about Mr. Calhoun.

22       Q    (By Mr. Hackney)  And I mean Mr. Calhoun,

23   did he ever -- did he ever complain to you about

24   Chief Corbin?

25       A    Yes.

ORLANDO SMITH - 2/26/2024

```
 1        Q     What complaints do you remember
 2   Mr. Calhoun making to you about Chief Corbin?
 3        A     That he was never at work.
 4        Q     And how often would that happen?
 5        A     I don't know.
 6        Q     Any other complaints you remember?
 7        A     That was probably the only primary one.
 8        Q     And did you talk with Mr. Calhoun about
 9   your testimony today at all?
10        A     No.
11        Q     Did you talk to Mr. Schmalbeck about your
12   testimony at all?
13        A     Uh-uh.  About testifying today?
14        Q     Today, yeah.
15        A     Yeah.  Probably with my phone's broke, so
16   I didn't get a chance to do anything.
17        Q     So you did not have a conversation with
18   Mr. Schmalbeck?
19        A     No.  I haven't talked to Mr. Schmalbeck,
20   not -- not since Friday, and other than that, I
21   hadn't talked to him at all.
22        Q     But you didn't talk about this case on
23   Friday?
24        A     No, we didn't talk about the case.
25        Q     Okay.  Besides your -- besides your
```

**ORLANDO SMITH - 2/26/2024**

1    taking photos of images?

2         A    No.

3         Q    But he did appear to be rifling through

4    papers from what you saw?

5         A    From what I saw.

6         Q    Sure.  And did you tell Ken that you would

7    do something about this, that you would talk to

8    David or --

9         A    No, no.

10        Q    You just expressed surprise and that was

11   pretty much the end of the conversation?

12        A    Yeah.  Well, no.  Yes and no.  So, yeah, I

13   was surprised, like "Wow, okay."

14        Q    And then what else was said?

15        A    Well, then he's like "I got this," and he

16   showed -- he had an audio tape of them getting into

17   an argument, them getting into arguments, and it was

18   like he was like having a culmination of things, you

19   know, so he had like a -- I guess a recording of

20   them getting into it.

21        Q    And that recording, do you remember if

22   they talked about the issue about -- about David

23   Calhoun trying to buy that car, was that on that

24   recording?

25        A    I don't know.  Yeah, I don't know, it was

1    just -- like I said, again, they were going back and

2    forth all the time.

3         Q    And when did you go to Barbados?

4         A    So I wound up going in January, but we

5    were supposed to go, I asked my wife, I think it was

6    like in August, late August, something like that.

7         Q    So this conversation would have been like

8    mid to late August of 2022; is that right?

9         A    Yeah, probably a couple weeks -- yeah, mid

10   to late August I believe.

11        Q    And did you -- did you report what Ken had

12   shown you to the other board members?

13        A    No.

14        Q    Why not?

15        A    Because I wanted to stay out of their -- I

16   wanted to stay out of their business, because they

17   would go -- they would be fighting back and forth

18   with each other, back and forth, and I didn't want

19   to get involved with that.

20        Q    Sure.  It didn't seem your place to step

21   into that circumstance; correct?

22        A    Correct.

23        Q    And you certainly didn't think that there

24   was anything that called for, "Oh, we need to

25   discipline Chief Corbin for this;" correct?

**ORLANDO SMITH - 2/26/2024**

1   his paperwork.  And we was -- Mr. Calhoun asked him

2   to pick up -- to take all his stuff with you while

3   we have our closed session.

4           One of -- the shop steward was going to

5   grab it and then realized there was a recording

6   device in there.  He said, "I'm not touching it, he

7   has to come back and get it."  And at that point, he

8   came back and got it.

9       Q    The device, was it on or do you know?

10      A    I have no -- I don't even know.  I don't

11  know.  I just know what happened there.

12      Q    Why was Ken Corbin fired?

13      A    I guess the easiest way to say is he

14  didn't do what was instructed of him to do, which

15  was to turn in all the equipment that he had.

16      Q    Anything else?

17      A    No other reason.  We gave Mr. --

18  Mr. Corbin ample opportunities to do this right.

19  Nobody wanted to fire him.

20      Q    Did he ever tell you that he had turned

21  over everything?

22      A    No, I didn't have any other conversations

23  with him.

24      Q    But you were -- you were one of the

25  decision makers to fire Ken Corbin; correct?

1    A    I think he said it was turned in.  He took

2  pictures of everything he turned -- well, I believe

3  he took pictures, and that wasn't with it.

4    Q    And of the three board members, was one of

5  you more of a driver of this termination than the

6  others; in other words, were you all equally

7  enthusiastic about it?

8        MR. ALLEN:  I'll object to the form of

9  that question.  Answer if you can.

10    A    I don't think anybody was enthusiastic

11  about it.  You know, it was horrible, it was

12  horrible.  You know, nobody wants to fire a person,

13  at least I don't.

14    Q    (By Mr. Hackney)  Was there ever any

15  discussion of, "Well, can we give Ken a warning"?

16    A    Well, we gave him the warning with pay.

17  That was the warning.  Then we asked him to get rid

18  of that -- "Whatever you got, get rid of it, and

19  we're going to suspend you with pay."  And he

20  elected not to.  That's -- that's not on us.

21    Q    Did you ever tell anyone that it was --

22    A    And now I want to -- to think more about

23  this now, he got -- did you ask me why he was

24  suspended or terminated?

25    Q    Well, I think I've asked both.

ORLANDO SMITH - 2/26/2024

```
 1        A    So he got terminated for the -- for those
 2   recording devices that he still had in -- in the
 3   same place when we had asked him before to remove
 4   everything he had in his possession.
 5        Q    So prior to his termination, you're saying
 6   that Ken was told, "Remove the camera from your
 7   office;" correct?
 8        A    "Remove whatever recording, camera, video,
 9   whatever your devices you had, remove them from your
10   office, and we're going to suspend you with pay."
11        Q    Well, if he was suspended, was he allowed
12   to go into the facility?
13        A    No.
14        Q    Well, then how could he remove equipment?
15        A    He had 24 hours to get all his stuff out.
16        Q    How was that communicated to him?
17        A    It was a letter.
18        Q    There's a letter that says, "You have
19   24 hours to get your stuff out"?
20        A    Yes.
21        Q    So what devices did Ken have, recording
22   devices, in his office?
23             MR. ALLEN:  Objection, form, calls for
24   speculation.  Answer if you know.
25        A    I know I just recall the pictures are the
```

ORLANDO SMITH - 2/26/2024

```
1        Q    (By Mr. Hackney)  And David Calhoun was
2   less reluctant than you were; correct?
3            MR. ALLEN:  Objection, form, calls for
4   speculation.  Answer if you can.
5        A    He was the first to sign.
6        Q    (By Mr. Hackney)  So is that a -- is that a
7   yes?
8            MR. ALLEN:  No, it's not.  He answered
9   your question.
10           MR. HACKNEY:  Well, I don't think he did.
11  He said he was the first to sign.
12       Q    (By Mr. Hackney)  Was he more enthusiastic
13  than you?
14           MR. ALLEN:  And that calls for
15  speculation.  Answer if you can.
16       Q    (By Mr. Hackney)  Did you observe that he
17  seemed to be more enthusiastic than you?
18           MR. ALLEN:  I think he also testified
19  earlier nobody was enthusiastic, so I would say this
20  is also asked and answered.  Subject to that, you
21  can answer again.
22       A    Nobody wanted to fire him.
23       Q    (By Mr. Hackney)  If no one wanted to fire
24  him, why was he fired?
25       A    Because he didn't follow the instructions.
```

ORLANDO SMITH - 2/26/2024

```
 1              WITNESS SIGNATURE PAGE

 2

 3      I, ORLANDO SMITH, hereby acknowledge that I

 4  have read the foregoing transcript of my deposition

 5  testimony, given on the 26th day of February, 2024,

 6  by affixing my signature hereto.

 7

 8                          _____

 9                          ORLANDO SMITH

10

11      Subscribed and sworn to before me this _____

12  day of _____, A.D., 2024.

13      MY COMMISSION EXPIRES: _____

14

15                          _____

16                          Notary Public, within and for

17                          the State of Missouri

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

# RESOLUTION NO 20-02

WHEREAS, the Black Jack Fire Protection District of St. Louis County, is a political subdivision in the State of Missouri, duly incorporated according to the provisions of Chapter 321 R. S. Mo.; and

This Resolution replaces Resolution 17-02 for the Fire Chief, only.

WHEREAS, the Board of Directors of the Black Jack Fire Protection District desires to revise the present wage salary and benefits for the Fire Chief; and

NOW THEREFORE, BE IT ORDAINED BY THE BOARD OF DIRECTORS OF THE BLACK JACK FIRE PROTECTION DISTRICT AS FOLLOWS:

1. Salaries for the Fire Chief beginning with the First Pay Period of each Calendar Year (CY):
    a. CY 2019 - $150,000.00 per year paid in bi-weekly payments of $5,769.23.
    b. CY 2020 - $155,000.00 per year paid in bi-weekly payments of $5,961.54.
    c. CY 2021 - $160,000.00 per year paid in bi-weekly payments of $6,153.85.
    d. CY 2022 - $165,000.00 per year paid in bi-weekly payments of $6,346.15.
    e. CY 2023 - $170,000.00 per year paid in bi-weekly payments of $6,538.46.
2. The Vacation Leave Benefit, which does not carry over to any future years will be:
    a. 30 days of vacation per calendar year, effective on January 1 of each CY.
    b. Vacation based upon the previous CY service may be taken at any time during the current CY with the consideration for operational

EXHIBIT 7
BLACK JACK FIRE 000710

CONFIDENTIAL

requirements.  The Fire Chief and Assistant Chief shall strive not to be on vacation simultaneously.

3. The Sick Day Benefit will be:
   a. The Fire Chief will be granted sick leave due to illness or injury to the Employee, their spouse or children.  A doctor's certificate is required for two (2) or more days of absence.  Sick Leave will be earned on the basis of two (2) workdays for each month of service.
   b. Sick Leave may be accumulated to two hundred eighty (280) workdays.
4. Uniform Allowance will be granted:
   a. The Fire Chief will receive a Uniform Allowance of $600.00 annually. Purchase Procedures established by the Uniform Committee and approved by the Board of Directors is applicable.
   b. These accounts will be maintained by the department administration.

+Health, Dental, and Eye will be provided in accordance with the current Collective Bargaining Agreement, except that this Benefit is paid fully by the District on behalf of the Fire Chief

5. Sick Leave Incentive, 12 Holidays & pay, Maternity/Paternity Leave, Funeral Leave, Court Leave, Personal Leave Days, Medical Examinations, Life Insurance and AD&D, Employee Assistance Program, Disability Insurance, Alcohol and Drug Policy, Deferred Compensation Plan (457 Plan), Discipline, Educational Benefit, Training (with approval by the District Board of Directors), Re-Licensure, Working Conditions, Pension Plan and Sick Leave/Vacation Buyback shall be as provided by the current Collective Bargaining Agreement.
6. The Fire Chief may have representation and/or legal counsel, provided by said employee and at their expense, be present at any meeting between said employee and the District and/or its representative, pertaining to discharge, suspension or disciplinary actions, promotion or demotion or at any time the Employee perceives third party representation is warranted.
7. The preceding Pay and Benefits will be in effective with the first (1st) Pay Period of 2019.

BLACK JACK FIRE 000711

**CONFIDENTIAL**

8. Job Description of the Fire Chief is the Chief Operating Officer of the Black Jack Fire Protection District. His duties and responsibilities are as follows:

   a. Responsible for the proper response to all emergency and/or other calls for assistance by the citizens of the Black Jack Fire Protection District.

   b. Direct and manage the overall administration and operation of the District.

   c. Overall management of the fixed assets of the District, including buildings, equipment and apparatus.

   d. Maintain positive community relations and provide a safe environment for the community through fire prevention, code enforcement, education, suppression, investigation, rescue, EMS and mitigation of hazardous materials incidents.

   e. Represent District at various functions and in various organizations.

   f. Responsible for management of all employees (staff, firefighters, explorers).

   g. Input to disciplinary actions, terminations, promotions, hiring, etc.

   h. Counsel employees as needed.

   i. Educate and inform the public through community relations and speaking engagements.

   j. Respond to emergency situations and function within the Incident Command System.

   k. Develop policies and standard operating procedures for emergency and routine situations.

   l. Attend and conduct training as necessary to enhance the professional development of all members of the District.

   m. At times may be exposed to various elements of nature and hostile environments, either man-made (such as civil unrest) or natural.

   n. Maintain a working knowledge of the District's Standard Operating Procedures (SOPs).

   o. Responsible for all equipment issued to them by the District.

BLACK JACK FIRE 000712

CONFIDENTIAL

p. Responsible to always present a professional appearance and attitude when representing the District.

q. Agrees to work in a Labor Management style system.

r. The Fire Chief, Ankeneth Corbin, shall serve under the jurisdiction of the Board of Directors of the Black Jack Fire Protection District; and shall make regular and ad hoc reports as appropriate to and/or as directed to the Board of Directors.

10. Other Benefits. The Fire Chief shall be the beneficiary of all other usual and customary benefits, benefit plans and programs, as may be from time to time generally available to other District command rank and staff employees, provided the Fire Chief meets all necessary and appropriate qualifying events.

IN WITNESS WHEREOF, this Resolution has been duly passed and unanimously approved by the Board of Directors of the Black Jack Fire Protection District this 14th day of January, 2020.

THIS RESOLUTION PASSED AND APPROVED THIS 14th DAY OF January, 2020.

ROLL CALL VOTE: Director Calhoun, aye, Director Schmalbeck, aye, and Director Smith, aye.

STATE OF MISSOURI
COUNTY OF ST. LOUIS

I, Orlanda Smith, Secretary of the Board of Directors of Black Jack Fire Protection District of St. Louis County, Missouri, do hereby certify that the foregoing pages constitute a true and correct copy of Resolution 20-02 as adopted by the Board of Directors of the Black Jack Fire Protection District of St. Louis County, Missouri on the 14th day of January, 2020, as fully same appears of record.

BLACK JACK FIRE 000713

**CONFIDENTIAL**

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said District this 14th day of January, 2020.

David Calhoun, Chairman

Orlanda Smith, Director

Orlanda Smith, Secretary

Kenneth G. Schmalbeck, Director

BLACK JACK FIRE 000714

CONFIDENTIAL

# BLACK JACK FIRE PROTECTION DISTRICT

**Board of Directors**
David Calhoun, *President*
Orlando Smith, *Secretary*
Kenneth G. Schmalbeck, *Treasurer*

**Fire Chief**
Ankeneth Corbin
**Assistant Fire Chief**
Roger A. Ellison

**Battalion Chiefs**
David P. Schmidt
Thomas Torminio
David J. Parker

## CEASE AND DESIST TO CHIEF ANKENETH "KEN" CORBIN AND ORDER TO RETURN PROPERTY AND ADMINISTRATIVE SUSPENSION WITH PAY

The Board of Directors hereby orders you to cease and desist from any further recording, intercepting, or endeavor to intercept, oral communications or capturing images and/or videos without the prior consent to such interception of an audio communication or images of other parties. You may not utilize any active or passive devices to record any communications in connection with the District or capture any images in connection with the District.

Further, the Board orders you to immediately turn over all District property in your possession including, but not limited to, the District cell phone or phones in your possession, any District laptop in your possession, or any other electronic device in your possession owned by the District. Until the electronic devices mentiond above are returned to the possession of the District, you are ordered not to, in any way, delete, alter, modify, or erase any stored material or any other materials on any device. You are not to tamper with or change anything on these devices. You are to return this property immediately as noted above, but in any event not less than twenty-four (24) hours from your receipt of this order from the Board of Directors. You should also turn over possession of the District vehicle you use.

The District will designate to you to whom to return the District Property. During this administrative suspension (with pay), you are not to enter or remain on any District Property or District houses until further notice  This Administrative suspension shall remain in full force and effect until the Board, in its sole disretion, shall take other actions in connection with your employment.

**EXHIBIT  10**

5675 NORTH HIGHWAY 67, FLORISSANT, MISSOURI  63034
PHONE: (314) 741-9905                                          FAX: (314) 741-9917
*Serving The Community Since 1929*                    www.blackjackfd.org



BLACK JACK FIRE 00652

CONFIDENTIAL

This order to you was voted on unanimously by the Board of Directors on December 27, 2022.

BY: _David Calhoun_____

David Calhoun, Chairman

_Orlanda Smith_____

Orlanda Smith, Secretary

_Kenneth Schmalbeck_____

Kenneth Schmalbeck, Treasurer

BLACK JACK FIRE 000653

CONFIDENTIAL

To:        Mr. Daniel Bruntrager

From:      Metro One Investigations Inc.

Date:      January 2, 2023

    RE:    BlackJack Fire Protection District
           5675 US Highway 67
           St. Louis, Missouri

This report contains the search and test performed, together with the results of the Technical Surveillance Countermeasure (TSCM) investigation conducted at the Blackjack Fire District facility located at 5675 US Highway 67, St. Louis, Missouri.

December 29,2022 a Spectral Analysis of frequencies in the range of 0MHZ to 9 GHZ were conducted at the BlackJack Fire District facility to establish an electronic floor base. The Spectral Analysis base was utilized and compared with the Spectral Analysis conducted the following day, December 30, 2023.

    **No discrepancies were noted in the Spectral Analysis.**

December 29, 2022 an Infrared probed was conducted on the facility to detect any type of transmission utilizing light beans such as lasers for audio or data transmissions.

    **Negative results.**

December 30, 2022 the TSCM were centered on three areas, The Chief's Office, The Board Room and the Training Room.

Physical inspections were conducted in all three rooms. The inspection included all furniture, appliances, desk top items, desk drawers, cabinets, electrical outlets, switches, overhead space and closest.

EXHIBIT  11

BLACK JACK FIRE 001295

**CONFIDENTIAL**

**Location:**      **Chief's Office.**

Two items were found, photographed and seized.

On top of cabinet behind a photograph.

1: Olympus WS-852 Digital voice recorder with a micro SD card.

Chief's Office
On top of cabinet behind a cup.
2: A miniature black camera with microphone.
Chief's Office
Cabinet drawer.
Empty box for a Olympus WS Digital voice recorder (#1).

Two small light colored plastic devices with magnets were found, Security Control Transmitters, Fire and Security. The two items were photographed.

Multiple thumb drivers were noted. None were noted to be recording devices.

Multiple cell phones were noted.

**Location:**      **Board Room**

Nothing was noted as a result of the inspection.

**Location:**      **Training Room**

Nothing was noted as a result of the inspection.

Spectral Analyses were conducted on all three locations, the results were compared to the previously established floor base and repeated in each room with **no discrepancies noted.**

Camera probes were conducted in all three rooms. The only suspicious camera noted was Item# 2 found in the Chief's Office.

BLACK JACK FIRE 001296

**CONFIDENTIAL**

Carrier Current probe was conducted. This probe was conducted to determine if any hard wire line; a/c or telephone; weather in use or not (i.e.) turned off) was being utilized to transmit audio or video signals.

**No discrepancies were noted.**

An inspection of the Wi-Fi and IT Networks were conducted by Feather Shark LLC Network and <u>determined</u> the systems had no unauthorized devices connected. All devices were accountable to the Blackjack fire District.

Mr. Daniel Bruntrager the attorney for the Blackjack Fire District was contacted and apprised of the TSCM results. Mr. Bruntrager requested the small black camera and the voice recorder be seized.

The items were seized, photographed, packaged and will surrendered to Mr. Bruntrager

BLACK JACK FIRE 001297

CONFIDENTIAL



BLACK JACK FIRE 001298

CONFIDENTIAL



BLACK JACK FIRE 001299



BLACK JACK FIRE 001300

CONFIDENTIAL



BLACK JACK FIRE 001301

CONFIDENTIAL



BLACK JACK FIRE 001302

CONFIDENTIAL



BLACK JACK FIRE 001303



BLACK JACK FIRE 001305



BLACK JACK FIRE 001306

CONFIDENTIAL



BLACK JACK FIRE 001307

CONFIDENTIAL



CONFIDENTIAL



BLACK JACK FIRE 001309

CONFIDENTIAL



BLACK JACK FIRE 001310

**CONFIDENTIAL**

## BLACK JACK FIRE PROTECTION DISTRICT

5675 North Highway 67
Florissant, Missouri 63034
(314) 741-9905

**BOARD OF DIRECTORS**
David Calhoun, *President*
Orlando Smith, *Secretary*
Kenneth G. Schmalbeck, *Treasurer*



**FIRE CHIEF**     **ASSISSANT CHIEF**
Ken Corbin        Roger A. Ellison

**BATTALION CHIEFS**
David Parker
David Schmidt
Michael Brock

December 18, 2023

Mr. Ankeneth Corbin



RE:  Ankeneth Corbin Termination

Dear Mr. Corbin:

The Board has met in its executive session on January 17, 2023 regarding those issues of your employment.  You will recall on December 27, 2022 you were hand-delivered a document which required, amongst other tings, you to return certain property belonging to the District you had received during your employment.  In addition, your attorney, Jeff Hackney, received a letter on January 4, 2023 regarding your medical status and asking that you provide responses to question asked regarding your return to work by 5:00 PM on January 17, 2023.

The Board of Directors of the Black Jack Fire Protection District have determined that you have not returned all the property that you have received during your employment.  It is the Board's further understanding that a District device you previously received is still being utilized.  Also, there has been no response to the January 4, 2023 letter sent to your attorney regarding your return to work.

The Board also considered at the executive session that you, without consent of the Board of Directors and without knowledge of at least some of the employees of the District utilized electronic surveillance in and around the District during the course of your employment.  You admitted this to the Board of Directors at aboard meeting on December 6, 2022.  The Board also considered that there had been other instances of oral reprimand to you by the Board of Directors over the course of employment.

The Board has determined that for the efficient management of the District and its men and women employed there, to separate your service and terminate you from your employment with the District.  The Board has determined, because of the instances of insubordination and neglect of duties noted above, that you cannot effectively perform your duties as Chief and you have lost the confidence of the entire Board.  This termination is effective immediately.  All benefits you have accrued will of course be paid after consultation with the District's retirement benefits attorney.

**EXHIBIT  12**

**BLACK JACK FIRE 000573**

# CONFIDENTIAL

You will also be provided COBRA coverage, should you so elect this coverage. The Board of Directors regrets this decision, however, in order to effectively manage the District's operations for the future, this termination of your duties as Chief and your employment is necessary.

Orlanda Smith

Kenenth Schmalbeck

David Calhoun

BLACK JACK FIRE 000574